WILLIAM E. IRONS v. AMERICAN RAILWAY EXPRESS COMPANY and W. P. BOYLE, Appellants.—300 S. W. 283.

Court en Banc, December 2, 1927.

*Watts & Gentry, J. C. Sheppard* and *Arnot L. Sheppard* for appellants.

322

*Henson & Woody* for respondent.

DAVIS, C.—This is an action for malicious prosecution. The petition is in two counts. The first count is based on the original arrest and prosecution of plaintiff before a justice of the peace in Stoddard County on the preliminary hearing, charging burglary of an express office, and the second count is based on a subsequent prosecution in the circuit court for the same offense after his discharge by the justice. The cause was, on change of venue, sent from Butler to Mississippi County, and there tried. The jury returned a verdict for five thousand dollars actual and ten thousand dollars punitive damages on the first count, and two thousand dollars actual and three thousand dollars punitive damages on the second count.

The following facts seem to be conceded and the cause was tried upon the theory that at Essex, Stoddard County, the defendant American Railway Express Company, and the Missouri Pacific Railroad Company, maintained a joint depot in charge of a joint agent, and that on June 24, 1921, the depot was burglarized, with the consequent larceny of thirty-two pennies and a number of blank money orders, the property of the Express Company.

Plaintiff's evidence tends to show that on the afternoon of June 20, 1921, between five-thirty and six o'clock P. M., plaintiff boarded a train at Essex for Poplar Bluff, bumming his way from Poplar Bluff to St. Louis, and from St. Charles to Kansas City, arriving there on June 21, between four and five o'clock P. M. At Kansas City he mailed a post card to his father. He then bummed his way to Hutchinson, Kansas, arriving there June 22, where he met one Allmeyer, who hired him as a harvest hand and took him to Spearville, Kansas, where he resided, a town ninety miles west of Hutchinson; that evening Allmeyer took plaintiff to his home about nine miles from Spearville, where he remained with Allmeyer working in the harvest fields until the afternoon of July 9. On June 23, plain. tiff mailed a post card from Spearville to his father at Essex. He left Spearville on July 9, somewhere around six o'clock P. M., and proceeded by way of Denver and Salt Lake City to Los Angeles, arriving there July 17th or 18th. In Los Angeles he lived in a hotel conducted by his aunt, later obtaining a position with the Sun Drug Company, where he was employed at the time of his arrest.

Defendant Boyle was special agent of defendant Express Company. On August 13, 1921, Boyle executed an affidavit before a justice of the peace of Stoddard County, charging plaintiff with the burglary of the depot at Essex. Theretofore, on August 10th or 11th, 1921, plaintiff was taken into custody in Los Angeles, suspected of having committed the burglary. Shortly after August 13th, defendant Boyle was deputized by the constable of Stoddard County to proceed to California to conduct plaintiff to Stoddard County for trial. However, an express company agent named Helfrich, with plaintiff in charge, took him from Los Angeles to El Paso, where he delivered him to Boyle. Upon being apprehended in Los Angeles, plaintiff in charge, took him from Los Angeles to El Paso, where he then waived extradition. At El Paso plaintiff was met by Boyle and Beatty, special agents of defendant express company, and the three proceeded across the State of Texas to Texarkana, where Beatty left them, and one Murray, another employee, joined them and accompanied them as far as Poplar Bluff, the nearest point to Essex. Plaintiff, however, was taken by Boyle through Poplar Bluff to St. Louis. At Los Angeles, El Paso, Texarkana and St. Louis plaintiff was placed in jail, and at Los Angeles and St. Louis his Bertillon measurements and thumb prints were taken. During most of the trip from Los Angeles to St. Louis plaintiff was provided with Pullman accommodations. While traveling, the express company agents attempted to force plaintiff to confess the burglary, and at times threatened him. On one occasion, in so attempting, Beatty grabbed him by the nose and twisted it, causing it to bleed, saying to plaintiff, ''I will stomp your damn head through the floor if you don't

admit it." At Texarkana, while in jail, plaintiff became covered with vermin. Defendant Boyle failed to proceed to Los Angeles, but made on the warrant the following false return to the effect that he executed the writ in the city of Los Angeles on August 19, 1921, by arresting the plaintiff and bringing him before the justice of the peace. After plaintiff was discharged by the justice, Boyle interviewed the Prosecuting Attorney of Stoddard County and told him in substance that he would like to have him file an information in the circuit court. That he would be proud if an information was filed, because he believed plaintiff guilty, and that he would be proud to have an information filed to protect the company, which information the prosecuting attorney filed, subsequently dismissing the prosecution.

Regarding the investigation of the burglary, Boyle testified that on arriving at Essex he communicated with Murray, agent of the express company, and then visited the local agent, asking him about the robbery, and going over it with him. The agent handed him a letter signed "Jack" and written by the plaintiff. He then interviewed McDonald, present agent, and stated that McDonald gave him a lead, which started him working on plaintiff; that the information McDonald gave him was to the effect that plaintiff was seen around there about that time.

Defendants' evidence tends to show that the money orders stolen at the time of the burglary were later forged and cashed at some stores in Hutchinson, Kansas. That at the time of filing the affidavit, Boyle had the money orders and that he compared them with the handwriting on the letter signed "Jack," dated at Cape Girardeau, and, after going over the documents with some of the company officials, all concluded that the handwriting was one and the same. The writings were inspected under a glass. Upon going over the evidence with the prosecuting attorney Boyle executed the affidavit, the information was filed charging plaintiff with burglary, and the warrant issued. Boyle made no further investigation.

Murray, agent for defendant, testified that he interviewed McDonald, the relief agent at Essex, who told him that plaintiff had been around there, leaving about the time the robbery occurred. That several people around Essex said that plaintiff's reputation was not the best; that he was given the letter signed "Jack" and turned it over to Boyle; that he told Boyle that plaintiff's reputation was not the best and that plaintiff left the day following the robbery, as near as he could learn. Regarding plaintiff's reputation Murray said that the people with whom he talked told him plaintiff was noted for bumming his way around the country and not staying in one place very long; that was all they said about it.

Defendants' evidence tends to show that several of the money orders stolen at Essex were forged and cashed at Hutchinson, Kansas. One was cashed at the store of Jesse Stenge about July 9th or 10th, for $33.25, payable to Leonard Watson. It was presented at Stenge's store in payment for articles purchased amounting to considerably less than the face of the order. Witness Stenge, as well as three of his clerks at the store, identified plaintiff as being the man who made the purchases on that occasion, and presented the money order and received the change. The identification occurred two or three years afterwards, although they had not seen plaintiff during the interval. Plaintiff denied ever having seen the money order or that he was ever in Stenge's store on that or any other occasion. However, other writings conceded to have been written by plaintiff were submitted to handwriting expert Mechin, of thirty-five years' experience, who testified in substance that it was his opinion that the forged money orders and the admitted writings of plaintiff were written by the same person.

One of the forged money orders was cashed at the store of witness Hoagland on July 9, 1921. He stated that he saw plaintiff on the street at Charleston the night before plaintiff testified, while he and witness Carlson were walking down the street. Carlson testified to like effect. Plaintiff and four witnesses testified that he was not in Charleston at that time, but was in Essex, driving to Charleston the next morning in an automobile. Witness Carlson had seen and identified plaintiff on a prior visit to Charleston, at a time the cause was formerly set and continued.

Plaintiff signed a written statement at Texarkana after his arrest while being taken back for trial, which was a resume of his journey from Essex to Los Angeles, and which statement purported to state that he left Essex on June 25, 1921, the statement being transcribed by Boyle. He testified that the figures "25" and the letters "th," immediately following the word "June," were not written in the statement at the time he signed it, but that he saw Boyle write them in after he signed the statement, and protested. Boyle and Murray, however, both state that the above matter was in the statement at the time plaintiff signed it.

To support his evidence that he left Essex on June 20, 1921, plaintiff offered in evidence three post cards purported to have been signed by him, one of which he states was mailed on June 22, from Kansas City, but the post card shows it was mailed at twelve o'clock noon on some day in 1921, but the day and month are illegible. Another post card is shown as mailed June 23, 10 A. M., '21, and while same is not clear, we think we can rapidly decipher the word "Spearville," from which place plaintiff states he mailed it. However, "Spearville, Kan." is written in on the reverse side. The third

post card was mailed at the summit of Pike's Peak on July 11, 1921, but plaintiff testified that he did not go to the summit of the peak. In his deposition, however, he testified positively that he went to Pike's Peak.

Plaintiff's evidence shows that while in Denver he registered a letter to his father in which he enclosed two twenty-dollar bills. In his deposition he testified that he sent his father a money order for that sum, but after his father had reminded him it was not a money order, but two twenty-dollar bills, plaintiff changed his statement to that effect. This registered letter was mailed on July 12th or 13th, 1921. The evidence of the postmaster at Essex disclosed that his records show that plaintiff's father received at Essex a registered letter about July 14, 1921, mailed from Denver. Such other facts as are pertinent will be found in the opinion.

I. Defendants aver that the judgment is void because the Mississippi County Circuit Court lacked jurisdiction of the res, which averment is based on the illegality of the change of venue to that county.

The facts developed in that regard show that plaintiff filed the cause in the Circuit Court of Butler County. Later defendants filed their application, grounded on the prejudice of the inhabitants of Butler County against them, for a change of venue to Ripley County, the only county in the same judicial circuit with Butler County. The Circuit Court of Butler County refused to change the venue to Ripley County, but ordered the cause sent to Mississippi County, in the next adjoining circuit to Butler County.

The statute apposite is Section 1361, Revised Statutes 1919, as amended in 1921, found in Session Laws 1921, page 204, the pertinent portion of which reads:

"If reasonable notice shall have been given to the adverse party or his attorney of record, the court or judge, as the case may be, shall consider the application, and if it be sufficient, a change of venue shall be awarded to some county in the same, adjoining or next adjoining circuit, convenient to the parties for the trial of the case and where the causes complained of do not exist."

It may be well to state that we construe the words "next adjoining circuit" to mean a circuit adjoining a circuit in which the county in which the suit is filed is situate. and that Mississippi County was properly determined a county in the next adjoining circuit, within the meaning of the statute.

The question presented is wholly legal. It is based upon a bald application for a change of venue, without more. The contention runs that the trial court is bounden, under the statute, to change the venue to a county within the same circuit. The reading of the stat-

ute advises us that a circuit court, upon the filing of the application for a change of venue under the same circumstances here presented, is permitted a sound discretion in determining the county to which it sends the cause, which, if not abused, is decisive. That discretion comprehends some county in the same, adjoining or next adjoining circuit convenient to the parties for the trial of the case, and where the causes complained of do not exist. Certainly the legislative intent was that the circuit court call upon and use its personal and common knowledge and judgment in determining that a county is or is not convenient to the parties, and that the causes complained of do or do not exist, and, in determining these matters, it is invested with power to exercise a discretion to transfer the cause to any county within the confines limited by the statute, provided always the court does not abuse its discretion.

Notwithstanding our interpretation, defendants aver that both Sections 1361 and 1372 must be considered and harmonized in determining the construction to be placed on Section 1361, and that the well known canon of construction is applicable that two statutes will be construed so as to harmonize where possible, and where one construction will tend to make one of them meaningless and another construction will tend to make both plain, the latter construction will be adopted. The pertinent portion of Section 1372, Revised Statutes 1919, reads:

"Whenever any change of venue is applied for in any civil cause from any circuit court of any county, or city constituting a county, to any other county or such city, in another circuit, the party or person applying for such change of venue shall, with his application, deposit with the clerk of the circuit court the sum of ten dollars. . . ."

In discussing the question that the court, on application for change of venue on account of the prejudice of the inhabitants, must send the cause to another county in the same circuit, the defendants attempt to demonstrate that the statutes are meaningless unless they are harmonized and interpreted as meaning that it is obligatory on the court to transfer to a county in the same circuit. They argue that Section 1372 requires that the party applying for a change of venue to any other county in any circuit shall with the application deposit with the clerk of the circuit court the sum of ten dollars, but fails to require such deposit when the cause is sent to a county in the same circuit, and that it is therefore impossible for the applicant to determine whether the deposit of ten dollars is required with the application. They deduce from this reasoning that the cause must be sent to a county in the same circuit. But they fail to consider the purpose of Section 1361, which invests the court with a sound discretion to send the cause to a county within the confines limited by

the statute, convenient to the parties and where the causes complained of do not exist. The defendants applied for a change of venue, invoking a statute which invested the court with discretion to send the cause to some county in the same, adjoining or next adjoining circuit. Invoking the benefit of a statute subjects the appellants to its burdens, and as a burden was the deposit of ten dollars, it became incumbent on defendants to deposit same to be paid to the circuit judge trying the cause, if sent to another circuit, and if not, to be returned to the depositor. To rule otherwise would contravene what we think is the obvious meaning of Section 1361. In sending the cause to Mississippi County, the trial court, on the record submitted, did not err.

II. Defendants charge the court erred in giving Instructions 4-A and 5, reading:

"4-A. The court instructs the jury if you find and believe from the evidence in this case that the defendants, their agents, servants and employees, before instituting the prosecution against plaintiff, could have, by due diligence, ascertained facts which would have convinced a reasonable and cautious man that plaintiff did not break into and burglarize the depot of the St. Louis, Iron Mountain & Southern Railway Company at Essex on the 24th day of June, 1921, and that he bore a good reputation in the community in which he lived, then you are instructed that it was their duty to use such diligence to ascertain such facts, and if you find that the defendants, their agents, servants and employees, failed to use such·diligence and ascertain such facts, if you find such facts existed and could have been ascertained by defendants, their agents, servants and employees, by the exercise of due diligence before instituting the prosecutions, you may take these facts, if you find them to be facts, into consideration in determining whether said prosecution was without probable cause, and was actuated by malice as defined in these instructions.

"By the term 'due diligence,' as used in these instructions, is meant such diligence as a reasonably cautious man would exercise under the same or similar circumstances.

"5. The court instructs the jury that the warrant issued by J. C. Hutchings, Justice of the Peace, for the arrest of plaintiff, introduced in evidence in this case, had no validity outside of the State of Missouri. Now, if you find and believe from the evidence that the defendants, or either of them, by and through their agents, servants and employees, arrested plaintiff, or caused him to be arrested on said warrant in the State of California and brought to the State of Missouri, then you are instructed that such arrest was illegal and without warrant in law, and you may take this fact, if you find it to be a fact, into consideration in determining whether or

not said prosecution, described in the first count of the petition, was malicious. But if you believe and find that the defendant, by its agents, had probable cause to have the warrant issued by the justice, then the fact that plaintiff was arrested on an illegal warrant will not in itself justify the jury in finding a verdict against defendants or either.''

A. The first assignment in this regard avers that the instructions constitute a comment on the evidence and give undue prominence to the facts hypothesized, in that one instruction charges defendants with failing to properly investigate plaintiff's reputation, and the other improperly directs the jury's attention to the invalidity of the arrest warrant.

We refer to Ward v. Railroad, 277 S. W. 908, as stating the rule applicable, thus:

''It is not a comment on the evidence to require a finding of specific facts alleged, unless undue prominence is given to such facts and the jury directed as to the weight to be given them.''

While it is sometimes difficult to determine whether or not a given instruction improperly comments on the evidence, yet, guided by the above rule, we find no fault in the above instructions. As to Instruction 4A, after being required to find plaintiff's good reputation as a fact, the jury were merely authorized to consider defendant's failure to use due diligence in that respect, in determining whether the prosecution was without probable cause and was actuated by malice; and, as to Instruction 5, after being told of the invalidity of the arrest warrant, the jury were merely authorized to consider that fact in determining whether the prosecution was malicious, further cautioning the jury, however, that if probable cause was otherwise present, then the arrest on an illegal warrant would not of itself justify the jury in finding a verdict against defendants. Viewing the instructions in that light we do not think that undue prominence was given to the facts in that regard, nor were the jury directed as to the weight to be given the facts. They were merely authorized to consider said facts in connection with other facts in reaching a verdict.

B. Further complaint is made of Instruction 5 because it permits the jury to find malice from the illegality of the process upon which plaintiff was arrested. In support of the contention it is argued that malicious prosecution is founded upon the fact that the process of arrest was legal, whereas false imprisonment is founded on the fact that the process of arrest was illegal, which was accentuated in this case by the fact that plaintiff waived extradition and voluntarily agreed to return to Missouri, resulting in the immateriality of the invalidity of the warrant to any of the issues. In considering the proposition defendants fail to take into account: First, that plain-

tiff was arrested and incarcerated in Los Angeles on August 10th or 11th on suspicion of being responsible for the burglary, before the affidavit of Boyle, on which the information and warrant were based, was executed; and, Second, that Boyle, as special deputy, returned that he executed the warrant in Los Angeles on August 19th by arresting plaintiff and bringing him in person before the justice. These facts tend to show that plaintiff was arrested without probable cause, from which malice may be inferred. While we agree that a distinction exists in actions for malicious prosecution and false imprisonment, as defendants contend, yet the record tends to show that Boyle's return was false, and it may be inferred from it that the representatives of defendants, after plaintiff's arrest, detained him in custody by virtue of said warrant and that he did not waive extradition .until after his constructive detention under said warrant became operative. It is clear that the methods used in arresting and detaining him were illegal, notwithstanding a waiver of extradition, and we have no doubt, even in an action for malicious prosecution, that under the related circumstances, the constructive arrest of plaintiff, under said warrant, was evidence of malice, not because it is based on the illegality of the arrest, but because the illegal arrest is evidence of spite, ill will and want of probable cause. [Stubbs v. Mulholland, 168 Mo. 47.]

III. Defendants charge the court with error in giving Instructions 6 and 7, asserting that they are in conflict. Said instructions read:

"6. The court instructs the jury that there are two kinds of malice, malice in fact and malice in law; the former, malice in fact, in common acceptation, means ill will against a person; the latter, malice in law, means a wrongful act against a person, done intentionally, without legal justification. If, therefore, the jury believes from the evidence in this case that the defendants, or either of them, by their agents, servants or employees, in the institution or prosecutions mentioned in the evidence in this case, were moved by ill will against plaintiff, or that said prosecution, or prosecutions. were wrongfully or intentionally caused by them, or either of them, their agents, servants, or employees, without legal justification or probable cause, then the jury should, as against such defendant, or defendants, find that such prosecution, or prosecutions, were malicious.

"7. The court instructs the jury that the term 'malice,' as used in the instructions in this case, does not mean mere spite or ill will, but means a wrongful act intentionally done without just cause or excuse. By the term 'probable cause,' as used in the instructions in this case, is meant belief in the guilt of the accused, based upon facts and circumstances sufficiently strong in themselves to induce such belief in the mind of a reasonable and cautious man."

We are inclined to agree that said instructions conflict. Instruction 6 correctly defines malice in fact and malice in law, and in similar words and substance has been approved in Carp v. Insurance Co., 203 Mo. 1. c. 354. Instruction 7 correctly defines malice in law. [Bowers v. Walker, 192 Mo. App. 230, 182 S. W. 116.] A reading of both instructions demonstrates that Instruction 7 limits the effect of Instruction 6 to a consideration of legal malice only. It is true, however, that by said instructions the jury might have returned a verdict finding malice in fact only, but as the record discloses facts from which malice in fact may be inferred, Instruction 6 was not error. Instruction 7 properly defined malice in law, but narrowed the issues for plaintiff by definitely telling the jury to consider only malice in law. Notwithstanding the conflict, the jury could properly determine that either malice in fact or malice in law was present, no matter which they followed. Under these circumstances the conflict was harmless.

IV. Defendants maintain that, because defendants' evidence demonstrated the probable cause to institute the prosecution against plaintiff for burglary, the instructions to find for defendants offered at the close of the whole case should have been sustained. They state the burden rests upon plaintiff in a case of this character to prove affirmatively the want of probable cause; that plaintiff does this prima facie when he shows the prosecution terminated favorably to himself, but, when defendants' evidence tending to show probable cause has come in, the burden of going forward with proof shifts to plaintiff, the absence of which requires the court at the close of the whole evidence to sustain a demurrer; that plaintiff's evidence wholly failed to overcome the showing of probable cause made by defendants.

The evidence on the part of defendants demonstrating probable cause goes no further than tending to show, according to defendant Boyle's testimony, that he first obtained information of the burglary from a preliminary report, dated June 26th, forwarded by special agent Murray. Later, Murray took him to local agent Estes, and Estes handed them a letter dated Cape Girardeau, July 20, signed "Jack," Murray stating that it was the handwriting of plaintiff. He later received a letter from local agent McDonald, who subsequently stated, on a visit to Essex, that plaintiff was seen around there about that time, which Boyle followed up. The forged money orders first came to Boyle through the New York Auditing Department, and he had the money orders before he made the affidavit. Both Boyle and Murray went over them with some of the officials of the company. Several days were spent in going over them, and inspecting them under a glass; and they concluded the handwriting was

one and the same. Boyle concluded that personally, the others con-·curring with him. The officials examining the money orders were the financial agent, chief clerk and superintendent. The above steps were taken before the arrest of plaintiff. Boyle submitted the evidence to Assistant Prosecuting Attorney Daugherty, showing him the specimen of handwriting and everything he had. Boyle stated that he talked only to Estes and McDonald, local station agents, and probably to the station helper. He received whatever information he had through Murray, who gathered same.

Murray stated that he received information of the burglary and investigated the numbers of the stolen money orders. He made no further investigation until a few weeks later, just before plaintiff was arrested. He stated he received a tip from McDonald, relief agent, who said that plaintiff had been around there, leaving about the time the burglary occurred. In investigating plaintiff's reputation he was told that plaintiff's reputation was not the best; that he left there subsequently, the day following the robbery as near as he could learn, and that plaintiff was in the habit of traveling in box cars. He talked with several people regarding plaintiff's reputation for uprightness, honesty and as a law-abiding citizen, but failed to remember the names and could not state them, but they said plaintiff was noted for bumming his way around the country and not staying in one place very long. That is about all they said about it. The above was all the evidence offered by defendants tending to show probable cause for the prosecution of plaintiff in the first instance.

We do not mean to say that defendants could not, in a civil suit, notwithstanding the discharge of plaintiff, introduce evidence tending to show that plaintiff committed the crime charged. The issue involved here, however, goes to the probable cause that defendants had for instituting the prosecution. The evidence relative to plaintiff's reputation and his connection with the crime, save the similarity in handwriting between the letter signed ''Jack,'' and the forged money orders noted later, went no further than, as near as the special agents could learn, to show that he left Essex the day following the robbery, was in the habit of traveling in box-cars, and was noted for bumming his way around the country and not staying in one place very long. We think it cannot be gainsaid that, taken alone, such facts definitely show want of probable cause for the prosecution.

The only other evidence that might tend to show probable cause is the similarity of plaintiff's purported signature on the letter signed ''Jack'' with the money orders, all of which were examined and inspected under a glass by defendant Boyle and the express company's financial agent, chief clerk and superintendent, who concluded, according to defendant Boyle, that the handwriting on the letter and the money orders was one and the same. It is not shown that any of

the above examiners and inspectors were in anyway qualified as experts on handwriting, nor that said documents were submitted to a qualified expert before the institution of the prosecution. It is said in the note to 12 L. R. A. 457—that "of all kinds of testimony admitted in a court of justice, expert and opinion evidence as to handwriting is the most unsatisfactory; it is so weak and decrepit as scarcely to deserve a place in our system of jurisprudence. A distinguished jurist, commenting upon this grade of evidence, says, in confirmation of the above: 'Everyone knows how unsafe it is to rely upon anyone's opinion concerning the niceties of penmanship. Every degree of removal beyond personal knowledge into the domain of what is sometimes called with great liberality scientific opinion is a step toward greater uncertainty and the science which is generally diffused is of very moderate value.' "

Here we have non-qualified witnesses attempting to examine and inspect documents concerning which they are not qualified to speak. Such evidence, as tending to show probable cause, is of no probative value. But more than that, the situation presented demonstrates that the inspectors of the documents, prior to the burglary, had no acquaintance with plaintiff's handwriting. In 22 Corpus Juris, 629, it is said: "While it has been held that the mere fact that the witness acquired his knowledge of the person's handwriting after the controversy arose goes to the weight and not to the competency of the evidence, there is considerable authority for the view that it must affirmatively appear that the knowledge or standard of comparison was acquired before any dispute arose."

In Board of Trustees v. Misenheimer, 78 Ill. 22, it was said that the examination of a signature after its denial was clearly insufficient to entitle him to give his opinion in evidence; that his knowledge was acquired under circumstances tending to bias his mind, imperceptibly though it may have been to himself. It is scarcely probable that he would not have some impression as to the genuineness of the signature before he examined the guardians' report. When, therefore, he investigated, however honest he may have believed himself to be, the natural tendency of his mind would most likely find something to confirm his preconceived opinion. In this way important differences may have been overlooked, and slight resemblances greatly magnified.

The situation here presented is the examination of a letter, by defendant's agents, purported to have been written by plaintiff, with some forged money orders, after the burglary occurred. Following the rule enunciated in the Illinois case, which we think is sound, the evidence was clearly insufficient to show probable cause. However, considering that expert and opinion evidence as to handwriting is unsatisfactory and weak, it was for the jury to determine, under any

theory, whether such evidence demonstrated probable cause. In this instance the jury found that it did not.

V. It is asserted that the trial court should have peremptorily instructed the jury to find for the defendants on the second count of the petition, because plaintiff's evidence failed to show that defendants caused the institution of the prosecution in the circuit court against plaintiff.

Defendants argue that there is nothing but a scintilla of evidence to show the defendants had anything to do with the institution of the second criminal prosecution. The evidence in that regard tends to show that Prosecuting Attorney Ray had a conversation regarding the filing of the information in the circuit court, and that, if he remembered correctly, he thinks Boyle told him that he would like for him to file the information there; they discussed the matter as to the justice turning plaintiff loose, and Boyle thought he was guilty; that if his memory was correct, Boyle said, if Ray would file the information, he would be proud if he would file an information to protect the company; something of that nature. He did not remember just the words. Ray filed an information against plaintiff in the circuit court; that Ray and Boyle had some correspondence, and Boyle came to see him a time or two, maybe three times; that Boyle and Ray discussed the facts stated in the letters, and when the case was set for trial Boyle was not there, and Ray nollied the case.

The testimony of Boyle was to the effect that he at no time suggested to the prosecuting attorney that the second prosecution be instituted, and told him that he would have to see his superiors before he could do anything further with the matter. He talked the situation over with his superior officers, and it was determined not to have anything to do with it unless the prosecuting attorney started another prosecution on his own motion, in which event the express company would lend him whatever aid it could.

Defendants maintain that the memory of the prosecuting attorney was extremely dim and hazy relative to the second prosecution, while that of Boyle was quite positive; that Boyle's recollection is correct is shown conclusively by later events and by the correspondence; that the express company made no further move in the matter except upon the suggestion and request of the prosecuting attorney; they state that it is quite true that the prosecuting attorney's testimony furnishes a scintilla of evidence, but not more than that, that defendants instigated the second prosecution, and that a scintilla is not sufficient to make a prima-facie showing. Defendants rely on Layton v. Chinberg, 282 S. W. 434. It is there said the witness was unable either to quote the exact words of defendant or give their

substance; that it did not constitute substantial evidence, it was a mere scintilla, and for that reason a verdict based upon it would necessarily have to be set aside.

The evidence in the Layton case is unlike that in the present case. When the prosecuting attorney said "if I remember correctly he told me he would like for me to file the information;" "that he thought he was guilty," and that "if my memory is correct Mr. Boyle said if I would file the information, he would be proud if I would file the information to protect the company—something of that nature, I don't remember just the words," the prosecuting attorney was stating his best recollection of the substance of the conversation. The prosecuting attorney was stating the substance of the Boyle conversation, and a witness's best recollection of the substance of a conversation has ever been held admissible. This constituted more than a scintilla of evidence, properly requiring the issue submitted to the jury.

The evidence further tends to show that defendant Boyle and the other agents of the express company, at Boyle's request and with the knowledge of the company, were working on the case after plaintiff's discharge by the justice; that special agent Murray, after the second arrest of plaintiff, was endeavoring to induce one Montgomery to execute an affidavit that plaintiff did not leave Essex until June 24th or 25th.

Defendants' connection with the prosecution in the circuit court may be shown by facts and circumstances from which the ultimate fact may reasonably be inferred. The steps taken by Boyle in connection with the second prosecution and his attempts to procure evidence to establish the guilt of plaintiff on the charge were known to his principal, and Boyle, with the knowledge, consent and approbation of the express company, voluntarily participated and aided in the prosecution. There was sufficient probative evidence to submit to the jury the issue of defendants' instituting the prosecution in the circuit court.

VI. Defendants complain of the introduction in evidence by the plaintiff of a letter written by one Montgomery, special agent of defendant express company, to defendant Boyle. In substance this letter stated that Montgomery had investigated plaintiff's actions at Spearville, and found that plaintiff was at Hutchinson, Kansas, on June 22, where he was hired by one George Allmeyer, living eight miles southeast of Spearville; that plaintiff was with Allmeyer continually until July 9, when Allmeyer took him to town and paid him $67.50, by check on the First National Bank of Spearville, which cancelled check Allmeyer then had in his possession; that Allmeyer positively identified the photograph

which you sent to the postmaster as that of plaintiff, and there is not a chance of error as to date, as this man keeps a good record of his transactions, and these books show that plaintiff began working for him on June 23; that it occurred to writer of letter that the robbery of the depot might actually have taken place some days before it was discovered on June 24th; that Allmeyer is regarded as a high class citizen, and he is sure he could not be prevailed upon to make a false statement in regard to this man, who was a total stranger to him. The letter then states that in this connection he did develop a fact which might have some bearing on the case and might stand investigation. The facts further stated related to other men and to facts and a post office money order and locations.

The record develops, while the matter of plaintiff's prosecution was depending, that special agent Montgomery was investigating at Spearville the movements of plaintiff in connection with the burglary at Essex. As the agent of defendant, Montgomery was acting within the scope of his employment in making the investigation, and the transaction to which the letter relates was depending at the time when it was made. The letter written by him was a report to the first agent of the principal, regarding a matter both were then investigating. It was in the nature of an official report by one official to another, as contemplated by the rule reported in Phillips v. Railroad, 211 Mo. 419, 111 S. W. 109, and was generally admissible in evidence. Such portions as were immaterial, if any, defendants failed to have excluded, and therefore cannot complain. In passing we may say that the trial court did not err in refusing to rebuke counsel for plaintiff for discussing the letter and reading it to the jury.

VII. The defendants assert error because the trial court refused to rebuke counsel for plaintiff for the alleged improper, prejudicial and inflammatory argument to the jury. The matter complained of reads:

"MR. HENSON: A common man can't go get a man arrested and then get a warrant—poor people have poor ways.

"MR. SHEPPARD: We object to the statement of counsel that a common man can't go get a man arrested and then get a warrant and 'poor people have poor ways,' as being highly prejudicial and inflammatory and unfair argument.

"THE COURT: I think so. Court will direct the jury to disregard that remark about 'poor people have poor ways.' I don't know what it has to do with this lawsuit.

"MR. HENSON: Your Honor, I think that argument is legitimate —if I hadn't I wouldn't have made it.

"Mr. Henson: If we had a one-hundredth part, yea, if we had a one-thousandth part of the money the defendant has to spend in bringing witnesses, we would have brought them here.

"Mr. Sheppard: We object to the statement of counsel, 'If we had a one-hundredth part, yea, if we had a one-thousandth part of the money the defendant has to spend in bringing witnesses, we would have brought them here,' as being unfair, outside the record, highly inflammatory and prejudicial, and we ask that counsel be rebuked for making such argument to the jury.

"The Court: Overruled.

"Mr. Sheppard: I save an exception.

"Mr. Henson: I make those statements in answer to the argument of Mr. Gentry, who criticised us for not bringing people into court."

The above matter complained of sets forth fragments of the argument made by plaintiff's counsel to the jury, failing, however, to declare the logical sequence of the argument so that we may determine its force. Judging the proceedings in the trial court by the argument of both sets of counsel before us, an appellate court, where mere errors with which the trial court is charged are presumed discussed with dispassionate logic, we have no doubt, from the array of counsel noted, that the arguments to the jury in the court below were able, eloquent and heated, and that every opposing counsel probably over-stepped in some regard legitimate argument. We say this by way of parenthesis merely, although inferences to that effect may be commonly assumed. But it is before us that only a fragment of the arguments is set forth and that we could not possibly be as well fortified to pass upon the effect of the arguments as was the trial court. In Wendler v. Peoples, etc., Co., 165 Mo. 542, 65 S. W. 741, Valliant, J., said: "The trial judge having heard all the argument is in a much better position to know whether an improper influence has been exerted than the appellate court can possibly be with only a fragment of the speech quoted." In Allen v. Autenrieth, 280 S. W. 79, it is said: "It is largely for the trial court to determine the extent to which he shall interfere because of improper argument, and, unless such discretion has been clearly abused, the appellate court will not reverse the judgment for such cause." The trial court had this matter before it on motion for new trial, and there determined that the argument did not improperly influence the jury. We rule this assignment against defendants.

VIII. Defendants' final complaint is that the twenty-thousand-dollar verdict is so excessive as to conclusively show that it was the result of passion and prejudice, and so excessive as to shock the conscience.

Defendants argue that the evidence shows that plaintiff hoboed around the country and on this occasion after leaving Essex he refused to pay his railroad fare from Poplar Bluff through St. Louis, Kansas City, the State of Kansas and on to California, stealing rides on the railroad by riding the blind baggage as desired. Defendants further say that they honestly believed that he left Essex after the commission of the robbery; they again say it was proved most overwhelmingly that plaintiff was the identical man who passed some of the money orders in the State of Kansas, for he was positively identified by a number of witnesses who saw him cash the money orders, and the indorsements on the money orders, which were there indorsed in order to procure the cash, were shown to be his; that he recognized no obligation to be honest with the railroads, but in stealing rides associated with bums; that his social position was not very high; that he was not a conscientious and scrupulous witness, because he failed to state several times that signatures and writings shown him were his, stating, however, it looked something like his signature, but denying that he could say positively whether he wrote it or not; that he rode in the dust, the dirt and the heat, unlawfully, without shame or humiliation; that on his trip from California to St. Louis and to Essex he was not handcuffed, but was returned on trains, riding in Pullman cars among refined people, and well fed.

Plaintiff on the other hand states that his investigation fails to disclose a case approaching the gravity of the case at bar, or a case where the facts and circumstances were more aggravated. Plaintiff states that the evidence tends to show that plaintiff was a young man, reared in a rural community where the notoriety of his arrest and prosecution would result in greater damage than to one in a more densely populated community. That not one single fact or circumstance was shown against him; that defendants, without reasonable justification or excuse, branded plaintiff as a hobo, professional gambler, one averse to labor of any kind, earning his livelihood by his wits; that six men assisted in his arrest at the home of his aunt; that he was arrested without any warrant or authority in law, kept in jail six or seven days, without preferring a charge or advising him of a charge; that he was subjected to the humiliation of being photographed and measured by the Bertillon system for the identification of criminals in both Los Angeles and St. Louis, with the presumption that his photographs were placed in rogue galleries; that he was taken prisoner from Los Angeles more than two thousand miles, and on said trip was denied proper food, assaulted and confined in jail each night, and on one occasion was covered with vermin; that he was forced to make a written statement which was falsified in a material particular by defendants; that he was taken through Poplar Bluff to St. Louis, where he was importuned to confess the crime

of which he was innocent; because after a full, fair and impartial trial before the justice, in the presence of two agents of the express company, where the facts were developed such as would have convinced any fair-minded and impartial person that plaintiff was not guilty of the crime charged, and after his discharge by the justice, the defendants, acting through Boyle, induced the prosecuting attorney of Stoddard County to file an information in the circuit court charging plaintiff with committing the burglary; because plaintiff was compelled to give bonds, employ counsel and prepare his defenses; because defendants, acting through Boyle, attempted to procure evidence against plaintiff, and after acquiring facts which showed conclusively that plaintiff was not guilty, failed to instruct the prosecuting attorney to dismiss the cause, permitting same to remain until the March term of the court, when it was dismissed for lack of evidence; because defendants, with full knowledge of such facts as to disclose plaintiff's innocence, stated to the jury that plaintiff was guilty and his guilt would be shown to their satisfaction, and argued to the jury at the close of the case that plaintiff was guilty, branding him as a criminal who should be confined in the penitentiary; because of the wealth of the express company and the decrease of the purchasing power of money. The rule applicable to excessive damages in cases of this nature is found in Carp v. Insurance Company, 203 Mo. 295, l. c. 360, 101 S. W. 78, reading:

"It is also insisted that the damages allowed by the jury are excessive. The verdict is a large one, but in a case of this character the amount of damages is largely a question for the jury. The law concedes a wide latitude of discretion to the jury in actions of this class, and their verdict should not be interfered with unless the appellate court can say that it was the result of prejudice, passion or malice. Numerous considerations must necessarily enter into the question of what is just compensation in such a case, but no definite rule can be laid down to any of them. The law has provided that the jury shall decide this question. Disgrace is a relative term; what is such to one man is not necessarily so to another, and while it applies to each, its effect or measure is great or small as other conditions exist. Mental anxiety and pain caused thereby and humiliation and danger from a prosecution for a grave criminal offense, are all conditions for the jury, as well as jeopardy in which the liberty of plaintiff was placed by such prosecution. We are unable to say, after a careful consideration of all this evidence, that the verdict of the jury was such as to evidence passion, prejudice or malice towards the defendants by the jury."

Notwithstanding it was proven that plaintiff, without the consent of the railroads, and free of charge, rode the blind baggage, that information was before the jury to the fullest extent, and, subject to

clear and cogent evidence of passion and prejudice on their part, it was a question for the determination of the jury as to the actual and punitive damages due plaintiff for disgrace, threats and assault, mental anxiety and pain, humiliation, jeopardy and danger of criminal prosecution. While the amount of the recovery was rather large, yet, considering the determination of the matter on motion for new trial by an able *nisi prius* judge, who heard and observed the course of the trial, and in view of the present worth of money and its lessened purchasing power, we are unable to say that the verdict was such as to shock the conscience of the court.

The judgment should be and is affirmed. All concur, except *Walker, J.,* who dissents.

PER CURIAM:—This case having been transferred to Court en Banc the foregoing opinion of Davis, C., delivered in Division Two, is adopted as the decision of the court. All of the judges concur, except *Walker, J.,* who dissents.