OLIVER NELSON v. HEINE BOILER COMPANY, Appellant.—20 S. W. (2d) 906.

Division One, September 13, 1929.

*Jones, Hocker, Sullivan & Angert, Kelley, Starke & Hassett* and *Nagel & Kirby* for appellant.

*E. J. Hullverson, Mark D. Eagleton* and *Hensley, Allen & Marsalek* for respondent.

830

ATWOOD, P. J.—This is an action to recover damages for personal injuries alleged to have been sustained by plaintiff on September 30, 1924, while in the employ of defendant. From a judgment in favor of plaintiff for $15,000 defendant has appealed.

Plaintiff went to trial on his second amended petition which alleged negligence on the part of defendant in the following particulars: (1) that defendant caused a piece of sheet iron to be moved at a time when plaintiff was in a position of danger and defendant knew or should have known that in thus causing the iron to be moved plaintiff was likely to be struck and injured thereby; (2) that defendant negligently moved said iron without allowing plaintiff reasonably sufficient time to reach a place of safety; (3) that defendant negligently failed to furnish plaintiff a reasonably safe place in which to work in that plaintiff's place of work was insufficient, narrow and crowded; and (4) that defendant did negligently so attach the sheet iron to the chain by which it was to be moved by an overhead crane that the said sheet iron was likely to strike plaintiff if moved, because said chain was twisted so as to cause the sheet iron to swing toward plaintiff and plaintiff's safety was thereby endangered, and the manner of doing said work was unsafe and dangerous. As the alleged result of the aforesaid negligence it is charged that the sheet iron when moved did come in con-

tact with and strike plaintiff, inflicting serious and permanent injuries to his back, spine, vertebrae and sacral joints.

Defendant's answer consisted of a general denial and of affirmative allegations to the effect that whatever injuries, if any, were sustained by plaintiff were produced by the usual and ordinary risks incident to his employment, which he knew or should have known and which risks he assumed. Plaintiff's reply was a general denial.

Plaintiff's evidence shows that he was about forty years old when he was injured and for about two years prior to the date of his injury he had been working for defendant as a member of a laboring gang earning $24.90 a week. In addition to plaintiff this group of laborers consisted of Jake King, Charles Leffler, two foreigners called Matt and Julius, and a crane operator. King was the foreman and directed the other men in their work. On the day plaintiff was injured these men were engaged in moving sheet iron from the sheet iron shop to the boiler shop of defendant's building, a task which they had performed on previous occasions. The sheets of iron were eight feet wide, twelve feet long, one-fourth of an inch thick, and weighed about 500 pounds. The long sides extended from east to west, the west end being about four feet above the floor on a platform, and the east end being on the floor. The iron was moved by an electric crane with a ball-bearing arrangement at the top to permit turning. The method employed for attaching the sheet iron to the crane was to place one shoe on the north and another on the south side of the iron near the middle to keep it from slipping, and then hook heavy chains attached to the crane onto these shoes. The middle of the iron on this occasion was about five feet west of the chains as they hung straight down from the crane. Plaintiff and one helper were stationed on the south side of the sheet of iron to attach the shoe and chain, while Leffler and another helper were on the other side assigned to a similar duty. The foreman, King, was eight or ten feet east of the iron in a position to give signals to the crane man, who was seated thirty feet in the air directly above the iron. The signal consisted of raising the arm above the head. South of the sheet of iron and to the east of plaintiff was an iron column fourteen inches wide. Immediately west of this was an aisle about two feet wide leading to the south, and west of the aisle and about two feet south of where plaintiff was standing was a pile of angle pieces. When the sheet iron was lifted from the floor the west end swung to the south hitting plaintiff in the small of the back on the right side, pressing him against the north side of the iron column. Plaintiff further testified that he put on one shoe and Leffler put on the other, and when King went to give the signal plaintiff said: "Wait, Jake, the chain is twisted;" that King then said,

"All right, go ahead;" that he then swerved southeast toward the aisle to get out of the way, but was struck by the west end of the iron before he could get behind the column; that the chain was twisted on the north side, making it shorter and causing the iron to swing around south; that there was nothing to obstruct the view between King and himself. On cross-examination he said that the operation of the derrick was all right; that Leffler attached the shoe to the north side, and either Leffler or his helper pulled the chain over and hooked it on; that the crane had a third chain which was used in other work; that the east end of the post and the east end of the iron were about opposite each other with a space of about two feet between; that he was standing about three and a half feet west of the column; that he first noticed the twist of chain as King went to give the signal, that is, when he got his hand partly up; that the metal had not then begun to move; that the crane man was not near enough to hear what plaintiff said, but that King and Leffler could have heard him; that King, when he said, "All right, go ahead," was looking at plaintiff and was talking to him; that this crane man saw the chains; that it was twisted so one twirl could have taken the twist out; that the metal hit on one else; that he turned to get away and was caught between the iron and the north side of the column while facing southeast, and that he had not come in contact with the post until he was struck and forced against it by the west end of the iron; that he had never previously complained of pains in his back while at work; had never previously experienced such pains, and had not asked to be relieved of any tasks.

Jake King, the foreman, testifying for defendant, said that the east end of the sheet was about three and one-half feet east of the east end of the column; that the column was two feet south of the iron; that there was an open four-foot passage way west of the column, and that plaintiff was standing about the middle of the sheet in line with the edge of the aisle; that he was close enough to plaintiff to converse with him, but did not hear him say anything, nor did he say anything himself; that he did not pause at any time in giving his signal; that the only effect a twist in a chain would be to cause one side of the chain to be slightly higher than the other. His version of the occurrence was that the sheet iron slid eastward and the northeast corner caught on a water leg, causing the west end to swing south and strike plaintiff; that the other man on the south side was in the passageway west of the column and out of the way, but plaintiff tried to stop the movement of the sheet iron toward him and tried to step aside too late; that plaintiff had complained of pains in his back before this date and other men had relieved him of work. On cross-examination King admitted that a

twisted chain would cause the sheet iron to swing one way or another; that this sheet was supposed to move east, but instead the west end swung south; that when the sheet iron caught the water leg the crane man saw this and stopped raising the sheet; that before giving the signal he saw the shoes and chains were properly fastened, and knew and realized the proximity of the sheet iron and the water leg; that he was in charge of all the work in connection with moving the sheets.

Markey, the crane man, testified that from his position he could see the chains; that they were not twisted; that King gave the signal with his hand and did not pause in bringing it up; that he could not hear conversation on the floor; that the men were in the clear when the signal was given by plaintiff, but the sheet slipped and the west end started to move toward the south; that plaintiff tried to stop it and then turned and ran between the post and the sheet; that before striking plaintiff the northeast corner slid down and struck the water leg, causing the sheet to turn; that when the metal hit the water leg he stopped raising it; that he did not see the water leg before raising the metal.

Leffler testified that he was working opposite plaintiff on the north side of the sheet iron; that he heard nothing said by plaintiff to King, or by King to plaintiff; that he attached the chain on the north side of the metal and it was not twisted; that after King gave his signal and the slack was taken out of the chains, the metal slipped east and struck the corner of the water leg, and the west end swung to the south; that plaintiff had his hand on the sheet, but seeing that he could not hold it he turned toward the post and the metal pushed him against it; that he had helped plaintiff with his work at times when he complained of pain in his back.

With reference to plaintiff's injuries plaintiff testified that he was immediately taken to Dr. Godfrey's office where his back was bandaged and treated with medicine; that his back hurt all the time; that there was a lump on the right side of the small of his back as large as a hen's egg; that he had been up and around ever since the accident; that his weight had increased ten pounds; that Dr. Godfrey treated him for two months and a half and then told him he was able to go to work and discharged him; that he did not go to work, because he suffered pain all the time and the condition of his back would not permit work, but that he did not go to any doctor from December, 1924, when he last saw Dr. Godfrey, until May 28, 1925, when he was first treated by Dr. Meehan to whom he was sent by his attorney.

Dr. Ernst, an X-ray specialist, testifying in behalf of plaintiff, said that he examined plaintiff and took X-ray pictures of his back,

spine and sacroiliac joint on January 9, 1925; that one of the pictures, identified as plaintiff's Exhibit A, indicates changes in the sacroiliac joint on the right side and shows evidence of chronic inflammatory changes, indicating that the bone has undergone a change; that this condition could have been caused by plaintiff's being struck in the back by the piece of sheet iron; that he could not say that the inflammatory condition was caused by any particular thing, but that the thickening of the bone here present could not exist without history of an injury; that the area of bone thickening was localized in a space one and one-half inches long, that is, the lower area of the right sacroiliac joint; that this was the only evidence of bone change he found; that there is little movement in the sacroiliac joint of a man forty years old.

Dr. Carroll Smith testified that he had examined plaintiff at the request of his attorney a few days before the second trial; that in bending his back the plaintiff indicated soreness in the right sacroiliac joint; that on an examination he found some thickening over the right sacroiliac region; that a blow on the back could cause the condition found; that an inflammatory condition such as was found might come from an infection, and that a man forty years old would be more subject to this than a younger man; that from the bone thickening alone he could not say whether or not plaintiff was disabled; that there would be a disturbance, and that the best treatment was rest with supports for the back; that if a man suffered severe pain he would become thin, but if this was not the case and he was inactive he would get fat.

Dr. Meehan testified that he first examined plaintiff on May 28, 1925; that he found no defects except in the region of the right sacroiliac joint; that at this place he felt a mass about the size of a lemon opposite the fourth sacral vertebra; that no such mass appeared on the left side; that he first used an adhesive strap on plaintiff's back and later an elastic belt; that there appears to be a chronic inflammatory process of traumatic origin in the neighborhood of the right sacroiliac joint; that the condition will likely be permanent; that the injury is productive of pain; that immobilization is the best treatment; that he has never confined plaintiff to bed, but it may be necessary for him to wear the belt for some time.

Dr. Peden, an X-ray specialist, testifying under date of March 22, 1926, said that he had just taken X-ray pictures of plaintiff which showed a haziness on the right side of the sacroiliac joint, with new bone thrown out around the joint; that such a condition is usually due to an injury; that the left side was normal; and that he found no disturbance of any kind except the bony growth on the right sacroiliac joint.

Dr. Ambrose, testifying for defendant, said that he examined plaintiff on June 9, 1925, by order of the circuit court; that in the right sacral region he found a bony thickening not present on the left side; that this enlargement was two and a half inches from the midline and two and a half inches above the uppermost part of the pelvic bone; that there was no evidence of a bone fracture or injury of any kind to the spinal column; that this thickening would be noticeable to plaintiff and might cause some discomfort, but would not prevent him from engaging in labor, because the joint structure was not involved and there appeared to be no nerve pressure. Comparing the X-ray pictures taken by Dr. Peden on March 26, 1926, with those taken by Dr. Ernst on January 9, 1925, he said that plaintiff had evidently grown worse; that the injury was serious and painful, and the best that could be hoped was that plaintiff would grow no worse; that the bone thickening is permanent, but if properly immobilized the bony growth would stop.

Dr. Godfrey, testifying for defendant, said that plaintiff came to his office on September 30, 1924, with contusions and lacerations of the lumbar region of the back; that he applied medicine and gave him some heat treatments; that he took an X-ray picture which showed no bony injury; that the bruise was right about the tip of the sacroiliac joint; that he continued to treat plaintiff until November 13, 1924, on which date plaintiff was not suffering from any injuries that he could determine; that his X-ray picture showed the bone to be in good condition on both sides of the sacral joint and normal in every respect; that it takes time for a change due to an injury to develop in a bone so that it will show in an X-ray picture; that plaintiff's Exhibit A shows no amount of bone thickening.

Appellant first assigns error in the trial court's refusal of defendant's Instruction A in the nature of a demurrer to the evidence offered at the close of the whole case. The reasons advanced are that plaintiff's third and fourth allegations of negligence were eliminated from the case by withdrawal and abandonment, respectively, and the first and second allegations are unsupported by the evidence and rest on reasoning built by inference upon inference. It is also said that plaintiff's recovery "offends against the rule that where an accident may have resulted from one of two causes, one of which, but not the other, is attended by legal liability, plaintiff must demonstrate that the former was the actual cause, and not rely upon mere speculation."

At the time the court refused defendant's Instruction A there had been no withdrawal and abandonment of plaintiff's third and fourth allegations of negligence. In reviewing the court's action on such a demurrer we must consider the record as it then stood viewing all the

evidence in the light most favorable to plaintiff. It is not necessary that all of the grounds of negligence pleaded be sustained by the evidence. Considering the proof in the light of plaintiff's first and second alleged grounds of negligence, to-wit, that defendant negligently moved the iron when it knew that plaintiff was in danger of being struck thereby, and without allowing plaintiff reasonably sufficient time to reach a place of safety, we find that when foreman King started to signal the crane man to lift the iron plaintiff noticed that the chain on the north side was twisted and instead of immediately leaving his position in close proximity to the iron, which was obviously a place of danger when the iron began to move, he stayed to call the foreman's attention to the twisted chain. Plaintiff says he called loud enough for the foreman to hear him. At that moment the foreman had only commenced to give the signal and the iron had not moved. The proved custom and practice was not to move a load with a twisted chain and plaintiff after giving this information and observing the foreman hesitate in giving the signal had a right to assume that movement of the iron would not immediately begin; foreman King was in full charge of the movement of the iron and of the men working under him, including plaintiff. It was his duty to see that the iron was not moved with a twisted chain. He was standing where he could see plaintiff's position, observe his danger and hear his call, but notwithstanding all this he caused the iron to be moved immediately without giving plaintiff an opportunity to reach a place of safety. It is true that many of the matters testified to by plaintiff were controverted by defendant, but for the purpose of this demurrer plaintiff's proof and every inference from the whole evidence favorable to plaintiff's case must be taken as true. There was ample evidence to support plaintiff's first and second assignments of negligence without piling inference upon inference. As for appellant's suggestion that the jury was left to speculate whether the swinging of the iron was caused by the twisted chain or was the natural result of the ball-bearing attachment, we think it is entitled to no weight. Defendant was guilty of negligence under the pleadings and proof in moving the iron at all while plaintiff was in this position of danger or without giving him an opportunity to reach a place of safety.

What we have just said also disposes of the principal grounds of the error next assigned by appellant as to instruction numbered 2 submitting plaintiff's first and second assignments of negligence. The instruction is as follows:

''The court instructs the jury that if you find and believe from the evidence that on the occasion in question plaintiff was struck by a piece of sheet iron and injured thereby, and that said piece of

sheet iron was moved by the defendant pursuant to the orders of its foreman, if you so find, at a time when plaintiff was in a position of danger of being struck and injured thereby, and that the defendant knew, or by the exercise of ordinary care should have known that in thus causing said sheet iron to be moved under the circumstances aforesaid, if you do so find, the plaintiff was likely to be struck and injured thereby, and that the defendant did thereafter cause said sheet iron to be moved and did not allow the plaintiff a reasonably sufficient amount of time within which to reach a place of safety away from said sheet iron, and that the defendant in thus causing said piece of sheet iron to be moved under the circumstances aforesaid, if you do so find, and in failing, if you do so find, to allow the plaintiff a reasonably sufficient amount of time within which to reach a place of safety, did then and there fail to exercise ordinary care and was guilty of negligence and that plaintiff was injured as a direct result of the aforesaid negligence on the part of defendant (if you find defendant was guilty of negligence in causing said piece of sheet iron to be moved under the circumstances aforesaid, if you do so find, and in failing to allow plaintiff a reasonably sufficient amount of time within which to reach a place of safety, if you do so find), then your verdict must be in favor of the plaintiff and against the defendant.''

There is no merit in the contention that this instruction is broader than the evidence. Defendant's evidence was that the metal was not moved until all of the workmen were in the clear, thus conceding that their original proximity to the iron was a place of danger. The instruction does not predicate recovery upon an assumed risk and hence does not conflict with defendant's instruction numbered 8 on assumed risk.

Counsel for appellants say that the trial court further erred in refusing to give instructions C and D requested by defendant. Instruction C authorized a finding that plaintiff and Leffler were fellow-servants if certain conditions were found to exist. Instruction D directed a verdict for defendant if plaintiff's injuries resulted directly and solely from the negligence of his fellow-servant, Leffler, if he was found to be such. We fail to see the propriety of these instructions in the light of the assignments of negligence submitted. Consideration of the fellow-servant doctrine was not necessary to a determination of these assignments and such instructions were properly refused.

We now come to errors assigned on account of the alleged prejudicial remarks of counsel for plaintiff in his closing argument, of

the alleged prejudicial remarks of the court, and of the alleged excessiveness of the verdict.

In his closing argument counsel for plaintiff said: "They speak of lack of appreciation. I think the defendant is the one showing lack of appreciation. They would drop a dime in a blind man's pocket and then counterclaim for—." Counsel for defendant objected to the last remark as prejudicial, asked that the jury be instructed to disregard the statement, that it be stricken out, and that the jury be discharged. The court properly overruled the objection because the remark was not an unreasonable rejoinder to defendant's argument that plaintiff had shown himself ungrateful. But counsel for plaintiff did not stop there. Later in the same argument he said: "Did they employ him again because he was a thief and a scoundrel—" Counsel for defendant objected to this remark on the grounds that there had been no testimony or remark of any kind warranting such a statement, that it was out of the record and prejudicial, and asked that the jury be discharged. The objection was overruled. Counsel for plaintiff thereupon asked the court to admonish opposing counsel for stating that he was outside the record, and the court remarked: "You are within the record, Mr. Eagleton." Counsel for defendant thereupon objected and excepted to the court's statement. Evidently the court thought that plaintiff's counsel meant defendant had insinuated or sought to show that plaintiff was "a thief and a scoundrel," but we have searched the record in vain for something that would support the remark. Defendant did show that plaintiff had been convicted and imprisoned for non-support, but this was for the stated purpose only of showing that prior to his ·alleged injury he was disinclined to work. Counsel's remark was entirely outside the record, evidently made for the purpose of causing resentment against defendant, and prejudicial. Possibly the prejudicial effect could have been overcome by a proper rebuke on the part of the court. But instead of administering such the court aggravated the error by assuring counsel that he was within the record, thus in effect approving counsel's insinuation. Considered in the light of counsel's remark and the whole record the court's comment was highly prejudicial, and because of both untoward occurrences the judgment should be reversed and the cause remanded. [Chawkley v. Wabash Ry. Co., 297 S. W. 20, 30; Henry v. Illinois Central Railroad Co., 282 S. W. 423, 425; Stroud v. Doe Run Lead Co., 272 S. W. 1080, 1083; Bowles v. Wabash Ry. Co., 271 S. W. 851, 853.]

On the whole record we regard the verdict of $15,000 as excessive. Plaintiff was struck in the small of the back by the swinging sheet

of iron. He alleged injuries to his spine, back, sacroiliac joint and nervous system. There was no evidence of injury to the spine or to the nervous system. The testimony limited the injury to the right side of the back in or near the sacroiliac joint, the left side being shown to be in good condition. The condition complained of was a growth of bone said to be serious and permanent, but there was uncontradicted evidence that the growth would cease and the pain stop if the part was rendered immobile by use of a belt or brace. The evidence was contradictory as to whether or not he was able to work at and prior to the time of the trial. Plaintiff was never confined to his bed on account of this injury. In November or December, 1924, Dr. Godfrey discharged him as free from pain and able to work. He says that he continued to suffer pain and was unable to work, but it is significant that notwithstanding Dr. Ernst, who at the trial testified in his behalf, on January 9, 1925, took X-ray pictures purporting to show a serious injury to the sacroiliac joint, no effort was made to immobilize the joint, which was concededly the proper treatment for such an injury, and plaintiff sought no medical advice or treatment from the time he was discharged by Dr. Godfrey until May 28, 1925, when his attorney sent him to Dr. Meehan on the eve of the first trial. This appeal is from a second trial in the same court, only nine of the jurors agreeing to the verdict. At the first trial plaintiff had a verdict for $7500. The court suggested a *remittitur* reducing the amount to $4500, and on plaintiff's failure to enter such *remittitur* defendant's motion for a new trial was sustained. Under Sections 1424 and 1454, Revised Statutes 1919, the court could not again grant a new trial on the ground of excessiveness of verdict. Counsel for appellants cite several cases to show that the amount of the last verdict was reasonable, but in the cases cited there was clear and abundant proof of more serious injuries and absolute disability.

Because of the errors above noted the judgment is reversed and the cause remanded for a new trial. All concur.