MARY MARLOW v. NAFZIGER BAKING COMPANY, a Corporation, Appellant.—63 S. W. (2d) 115.

Division One, August 24, 1933.

*Green, Henry & Remmers* for appellant.

792

*W. R. Carver* and *Terry & Terry* for respondent.

HYDE, C.—This is an action for damages by a widow for the death of her husband who was killed when a truck, belonging to defendant, struck a buggy in which he was riding with his son. The charges of negligence, which were submitted to the jury, were: Driving at a high and dangerous rate of speed and driving to the left of the center of the highway. The jury returned a verdict for the plaintiff for $8,000 and from the judgment entered thereon the defendant has appealed.

Plaintiff's account of the accident was given by the son of the deceased who was driving the buggy. He testified that as he was driving south on State Highway No. 61, approaching a curve, he saw defendant's truck coming north, also approaching the curve; that it was running from fifty to sixty miles per hour; that when the truck was about 300 yards from them he saw it was west of (on the left side of) the center of the highway; that it ran back and forth across the black line in the center of the highway; and that to avoid it he got clear off of the concrete on the west (right-hand) side onto the shoulder. In spite of his efforts, the truck struck the buggy head-on and then turned over on it while it was on the right-hand shoulder of the highway, killing the horse and completely demolishing the buggy. Plaintiff's husband was killed and her son who was driving, was severely injured, remaining unconscious for some time. Plaintiff also showed by a filling station operator who heard the crash and ran immediately to the scene, a constable, and a deputy sheriff who came soon afterwards and made measurements, that there were skid marks, such as tires sliding on the pavement would make, starting at the top of the curve, extending on the west (left-hand) side of the highway for about 200 feet, then going back on the east (right-hand) side about fifty feet to the outside edge of the highway (one track went off the concrete), then turning back to the left side of the highway, and going to the place where the truck lay on its side on top of the wreckage of the buggy. They also said that the buggy was slid along under the truck fifty feet. The driver of the truck who testified on behalf of the defendant said that he was driving between

794

twenty-five and thirty miles per hour; that as he rounded the curve the truck began to weave from one side of the road to the other; that he applied his brakes so that he skidded his wheels; that he tried to steer the truck to the right but could not control it; and that he could not account for its actions. It was also shown by defendant that there was a governor on the truck set to hold its maximum speed to thirty-eight miles per hour.

■ ■ Defendant assigns as error the submission of the question of high and dangerous rate of speed, contending there was no evidence upon which to base it. The only witness who testified to the speed was plaintiff's son who was driving the buggy. On direct examination he gave his estimate of the speed as fifty to sixty miles per hour without any testimony as to his experience with automobiles to show his qualifications to judge it. However, on cross-examination this estimate was repeated and the witness's experience and qualification shown to be that he had driven several different kinds of automobiles and trucks and that he had himself driven them from fifty to sixty miles per hour. We hold that sufficient experience was thus shown to make his testimony as to speed substantial evidence, the weight of which was for the jury. The distance which the brakes dragged the wheels on the pavement and the violence of the crash thereafter was also some evidence of high speed. There was no error in submitting this charge of negligence.

■ ■ Defendant also assigns as error the action of the court in refusing to strike out an answer of the filling station operator in which he stated his opinion that defendant's truck made the skid marks, which he testified he saw, and also in permitting the constable to testify concerning these skid marks. On direct examination the filling station operator started to say that the skid marks were made by the truck, but upon objection plaintiff's counsel withdrew the testimony and the court ordered it stricken out and admonished the witness "to tell what he saw without giving any of his conclusions." On cross-examination, the witness was questioned further about these marks and testified that they were marks like a wheel skidding would make and that he knew by his own experience that skidding wheels made that kind of a mark. Thereafter, the cross-examination continued as follows:

"Q. Of course, you didn't see this truck when it first started to make that mark, if it did make it? A. Oh, no, sir. Q. You don't know anything about that? A. No. Q. Now, Mr. Friedmeyer, how do you know that the truck you found turned over was the same truck you saw pass your place of business? A. Well, I saw the tracks, the marks there, the black lines, you know, of the tires, and they went right to the truck. Q. Clear from your station? A. Oh, no. From the top of the curve. Q. Well, you didn't see the truck

start making that track, did you? A. No, sir; but I have an idea the truck made it because I saw—.''

Defendant moved that this final answer be stricken out. The only reason given was that this answer was not responsive to the question. This argumentative cross-examination did call for the witness to give a reason for his evident belief, which the court had not allowed him to express, that the overturned truck was the one which passed his filling station just before he heard the crash and that it made the skid marks he found as he ran to the scene. This answer was, therefore, brought out as the result of defendant's own cross-examination, so that it will not now be heard to complain. Concerning the constable's testimony, we find that he was not allowed to state that the overturned truck made the skid marks but only that the skid marks led up to and connected with it. Defendant's objections went mainly to the constable's testimony that the marks were skid marks made by automobile tires and the only reason given for any of the objections was that the witness was not qualified. The witness, in fact, showed himself to be well qualified by his testimony as to his own experiences with automobiles and his experience in examining and making reports about highway accidents in his capacity as constable. Furthermore, the fact that the truck took practically the course of these tracks was hardly a controverted issue, because it appears from the truck driver's own testimony that it did weave from one side of the road to the other in a manner similar to the course these witnesses said was shown by these tracks. The kind of marks, which dragging automobile tires will make on concrete pavement, are familiar to almost every man and when a witness hears the crash, runs immediately to the place and finds such tracks leading up to and connecting with the overturned truck, it is difficult to see how, when the truck driver described a similar course with his brakes skidding his wheels, that this witness's statement that he thought the truck made the tracks, could be prejudicial.

Defendant also claims that the court erred in allowing the constable to testify that the truck driver said at the scene of the accident that the truck belonged to the defendant and that he was the driver. Defendant put the truck driver on the witness stand, and he said the same thing on direct examination. It was, therefore, an admitted fact, not a controverted issue, so there is no merit in that contention.

It is next contended by defendant that the court erred in giving on its own motion an instruction informing the jury that they were the sole judges of the credibility of the witnesses and that if they believed that any witness had knowingly sworn falsely to any fact or facts material to the issues in the case they could reject all or any portion of said witnesses' testimony. Defendant contends this is error because it amounted to an assertion by the court to the jury

that there was evidence to justify a finding that some witness had wilfully and knowingly sworn falsely to some material fact in the case. Defendant says that there was no reason whatever to believe that any witness had sworn falsely and that there was, therefore, no occasion for the court giving it. Defendant is in no position to make that contention here because it was contending that plaintiff's witnesses were guilty of perjury and set up as a ground for a new trial, "that the verdict and the amount thereof resulted from willfully false and misleading and perjured testimony offered on behalf of the plaintiff, and particularly testimony relating to the physical condition and earning capacity of the deceased." Defendant, at the time of filing its motion for a new trial, asked the court to grant it thirty days, before ruling upon the motion for new trial, to obtain affidavits in support of that ground. We, therefore, rule against this contention of defendant.

Defendant makes the further contention that the case must be reversed because of prejudicial remarks made by plaintiff's counsel in his closing argument. This is divided into three separate assignments of error each of which concerns a different subject covered by the argument and which we have separately numbered in the following excerpts from the record, which is all that the bill of exceptions contains, concerning argument of counsel:

I. "Senator Terry: We had just as much right to take the deposition of Gus Brown, the driver of that truck, as they had to take Mrs. Marlow's deposition. Mr. Sparling: Wait. I want to object to that. They offered that deposition and the Court ruled on it that it was not competent, and it was not admitted in evidence. Senator Terry: The Court please, that deposition is in evidence; we read it to him on cross-examination, and he admitted it. The Court: Yes, sir. Proceed with your argument. Mr. Sparling: Save our exception to the ruling of the court. Senator Terry: No, he was not honest like our people. He wouldn't give this deposition, no, because it might send him to jail or cause him to pay a fine. Mr. Sparling: Now, your Honor please, we object to that argument. There is absolutely no such testimony as that at all in this case. Senator Terry: No. It is an inference. Mr. Sparling: You are not going to argue this case on inferences, are you? We are objecting to it, and ask that it be stricken and the jury instructed to pay no attention to it. The Court: The objection is overruled. Mr. Sparling: Save an exception."

II. "Senator Terry: . . . I can see the truck strike the edge of that concrete and when it hit the edge of that concrete and he attempted to straighten it, it jumped over too far on the other side and— Mr. Sparling: Just a minute. Let the record show my ob-

jection to that, for the reason that there is not a bit of testimony in this case even tending to show any such fact. SENATOR TERRY: . . . and he lost control of it. MR. SPARLING: Wait, Senator Terry. I am going to make my objection to counsel's argument about the truck jumping on the edge of that concrete, or whatever it was, because there is absolutely no testimony of that kind at all. SENATOR TERRY: Don't take this out of my time. He don't want me to make an argument in this case— MR. SPARLING: Let the record show my personal objection to that. THE COURT: The objection is sustained. Counsel have a right to make their objections. Confine your argument to the testimony in the case, as you remember it. SENATOR TERRY: Yes, sir; all right. MR. SPARLING: Let the record show my objection and exception.''

III. "SENATOR TERRY: Ten thousand? Why, $10,000 is not too much for this corporation to pay that sends down into this county or adjoining county a machine of destruction and blots into eternity Theodore Marlow when he was doing everything he could to get out of the way, getting clear off the concrete and giving all the road, and even then they ran into his buggy and horse and killed him. You see what they have done here. They took away his right of life; they took from his widow the right to have him support her; they took from him and her all the things that men and women live for and— MR. SPARLING: Now, your Honor, I want to object to that portion of Senator Terry's argument that $10,000 is not too much for a corporation to pay who runs a machine of destruction into this county, and ask the court to instruct the jury to disregard it. It is a statement not supported by any evidence, a statement made for purely prejudicial reasons. This case is the same as a controversy between two individuals— THE COURT: Now, gentlemen, the court has given the jury the instructions, and they have heard the testimony and they remember it as well as you or Senator Terry or myself or anybody else, and the jury will pass on that testimony under the instructions and will disregard anything counsel may say that is contrary to the facts. MR. SPARLING: I desire to save an exception.''

Taking these in order we find that Part I of the argument refers to the fact shown on cross-examination of defendant's truck driver that he refused to answer questions, on the ground that it might incriminate him, when plaintiff attempted to take his deposition. It was shown by statements made to the trial court by defendant's counsel that the driver was charged with manslaughter, in connection with this accident, at the time plaintiff sought to take his deposition; that thereafter he was tried and convicted, but that a motion for a new trial had been sustained; and that the charges were still pending and awaiting trial at the time of the trial of this case. Therefore, the situation as to incriminating himself by testify-

ing was practically the same at this trial where he did testify as at the time of the depositions when he refused to do so. It also appears that defendant's counsel took the depositions of plaintiff and other witnesses for plaintiff, and in his cross-examination of them had attempted to show discrepancies between their testimony at the trial and at the depositions which might be construed as charging them with bad faith and false testimony (as was charged in the motion for new trial). This had undoubtedly been argued to the jury, before the above remarks were made in the closing argument for plaintiff, and they seem to be to a large extent retaliatory. [As to retaliatory remarks see Miller v. Collins, 328 Mo. 313, 40 S. W. (2d) 1062; Nelson v. Heine Boiler Co., 323 Mo. 826, 20 S. W. (2d) 906; Ranier v. Q. O. & K. C. Ry. Co. (Mo.), 271 S. W. 500.] It would seem that the statements made were meant and would be understood as a criticism of defendant's good faith and frankness about disclosing information available to it concerning the accident, and also of the good faith and credibility of the driver as a witness. Not knowing what defendant's counsel said on this subject, we cannot say that the trial court abused its discretion in overruling defendant's objections. [Ranier v. Q., O. & K. C. Ry. Co., supra.]

■ Concerning Part II, it is sufficient to say that the court sustained the objection on the ground that there was no testimony to show the facts stated by counsel. There was, in fact, evidence to show those facts in the testimony of the filling station operator, constable and deputy sheriff, about the skid marks indicating the course of the truck. The ruling of the court was therefore error against plaintiff and not against defendant.

■ As to Part III, plaintiff's counsel referred to the defendant as a corporation but did not argue that, as a reason for allowing the amount of damages he was asking. The jury did not, in fact, allow that much. It has been held that it is not necessarily improper for counsel to state that a defendant is incorporated. [City of Kennett v. Katz Construction Co., 273 Mo. 278, 202 S. W. 558.] Plaintiff's counsel, of course, had a right to argue what he contended were aggravating circumstances in discussing the question of the amount of damages which he claimed it would be proper to allow, since that is one of the matters specifically mentioned by the statute as proper to consider and there certainly was evidence of such circumstances. [Sec. 3264, R. S. 1929.] Of course, it was for the jury to decide whether they would accept defendant's theory of the accident or believe the contentions of the plaintiff. Counsel evidently was attempting to emphasize those aggravating circumstances which he considered showed excessive speed and gross negligence. At least, it does not appear that he had any other motive or that the jury would consider it in any other light. It may be conceded that counsel got close to the border line in both Part I and Part III, but we do

not feel justified in saying that it was prejudicial as a matter of law. As to its effect, the trial court had the best opportunity to judge. "To him it is given to hear the intonation of the voice . . . (of both witness and attorney) to see his manner, his cast of countenance, the glance of his eye, the behavior of the jury, their intelligence, their attention, and the whole network of small incidents creating our atmosphere about a case and tending possibly to a perverted result, or otherwise, none of which can be preserved in the bill of exceptions and sent here." [McCarty v. St. Louis Transit Co., 192 Mo. 396, l. c. 401, 91 S. W. 132.]

Concerning argument of counsel this court has more recently said:

"Argument of a case by counsel for the respective parties serves a useful purpose and is a vital part of our system of trial by jury. Counsel is allowed to state the evidence and all reasonable inferences therefrom most strongly for his client, and an objection cannot be sustained because he is doing so. While counsel should be restrained to a legitimate argument based on the evidence in the case and should not be allowed to present false issues or lead the jury to disregard the instructions of the court . . . yet wide range should be allowed in presenting the facts and deducing legitimate inferences therefrom, and the trial judge should be allowed large discretion in permitting or restraining the argument, and his rulings will generally be deferred to on appeal. [Goyette v. St. Louis-S. F. Ry. Co., 37 S. W. (2d) 552, l. c. 556.] . . .

"Where only a fragment of the arguments is before us and where the trial court had the matter before it on motion for new trial and there determined the argument did not improperly influence the jury, the trial judge, who heard all of the arguments, was in a much better position to determine the question than an appellate court can possibly be, and his discretion in the matter will not be interfered with unless clearly abused. [Wandler v. People's Housefurnishing Co., 165 Mo. 527, 65 S. W. 737; Irons v. American Ry. Express Co., 318 Mo. 318, 300 S. W. 283; Gettys v. American Car & Foundry Co., 322 Mo. 787, 16 S. W. (2d) 85.]" [Lewis v. Illinois Central Railroad Co., 50 S. W. (2d) 122, l. c. 127.]

In view of the fact that the trial court, which heard the whole trial and all the arguments, passed upon this matter upon the motion for new trial and found that the argument was not prejudicial to defendant, we will not now say that the trial court was wrong. We, therefore, overrule the assignments of error concerning the argument made by plaintiff's counsel.

The final contention of defendant is that the verdict was excessive. Deceased was fifty-six years of age and his wife was four years younger. He had worked for the Pittsburgh Plate Glass Company in their factory nearby for twenty years or more. Two or three years before he was killed, he had been retired by this company upon a

pension of a dollar a day. He lived on and farmed a 40-acre farm which he owned and worked for others at various kinds of work. Sometimes he worked upon jobs on which he furnished his team. He made from $3.50 to $6 per day and plaintiff estimated that his earnings would average from $12 to $15 per week. There was also evidence that he averaged as much as five and one-half days' per week work for others while his boys did the work on his own farm. He cut and sold wood in town for which he obtained $3.75 per load. He also cut wood for people on their own land at $2.50 a cord and the evidence was that "he cut and ranked two cords and a half a day." He had one son twenty years old and two grandsons, four and eleven, who lived at his home and who were taken care of and supported by him and plaintiff. It was shown that he was industrious and worked at everything he could get to do.

 In this connection, it is contended by appellant that the court committed error in not permitting cross-examination of plaintiff concerning the reason he was retired by the glass company. The only reason suggested by defendant's counsel for this line of questioning, at the time, was that it was offered "as being evidence of his last regular employment and last regular income." It had already been admitted that it had been his last regular employment and the court sustained the objection upon the ground that it was too remote and immaterial. However, if this was error it was cured by the fact that defendant was allowed to recall plaintiff for further cross-examination concerning the physical condition and health of deceased and to then show that plaintiff had stated in her deposition "he'd just, just, played out; burned out in the casting house is about all I know. Just played out from hard work." That was what defendant had offered to show when the court stopped the previous cross-examination upon that subject. Plaintiff, during this further cross-examination, testified that deceased had become better after leaving the glass company and was in fine physical health prior to his death. We think that if the jury believed he could cut and rank two and one-half cords of wood per day, there was substantial evidence of good physical condition.

Appellant's argument concerning the amount of the damages is, as follows:

"Striking an average of $13.50 for his wages and $7.00 for his pension, his average earnings were $20.50 per week, and his expectancy according to the American Experience Tables at 56 years was 16.7, so that he would have received, assuming that he had lived out his expectancy and was capable of working throughout the period, the gross sum of $16,456.00. There is no evidence in the record that he contributed anything to the support of his family, but in making the calculation as to the damages and for the purpose of argument we assume that he contributed half of his earnings to his family. This

would make a gross sum of $8,228.00. In awarding damages of this kind, it is the cash value of deceased's earnings which is the basis of the allowance. Figuring this cash value according to Carlisle's Tables of Mortality, which were introduced in evidence by plaintiff, and which are found in Sec. 7547, Revised Statutes of Missouri 1919, we arrived at approximately $4,500.00 as the present cash value of his earnings.''

This is in effect the same argument made by same counsel in the case of Steger v. Meehan, 63 S. W. (2d) 109, in which the opinion is handed down concurrently with this opinion. There we fully reviewed the authorities upon the question of the measure of damages in wrongful death suits by the widow, the matters which it was intended under our statutes should be considered in estimating the same, the discretion given the jury in computing such damages, and the power of an appellate court to alter their verdict and came to the following conclusions:

1. That a widow's recovery for her husband's death is not limited to the exact value of the proportion of his earnings which would likely be spent for her support during his expectancy at the rate he was earning just prior to his death.

2. That the statutory limit of $10,000 is not meant to be the maximum value of a human life, which can only be recovered upon showing the greatest imaginable loss of life expectancy and earning power under the most aggravating circumstances.

3. That the value of a human life cannot be ascertained by a precise mathematical calculation, but the loss, resulting to those entitled to recover for it, is a matter to be decided by the jury upon a consideration of all the facts and circumstances of each particular case.

4. That the jury is given by our statutes a broad discretion to compute damages for a wrongful death, within the limit prescribed. and they may base the amount upon the pecuniary loss of every kind and character which will necessarily result from the death, to those entitled to recover for it, and they may also increase or diminish such amount because of circumstances which they may find in mitigation or aggravation of the wrongful act, neglect or default which caused it.

5. This discretion granted the jury must not be exercised arbitrarily and their verdict must be justified by the evidence, but it will not be interfered with. unless it clearly appears that such discretion has been abused.

In this case not only does the evidence, when taken in the light most favorable to plaintiff, justify a finding of a pecuniary loss as great as the amount of the verdict; but the jury would also be justified in finding aggravating circumstances, if they believed the evidence showed loss of control due to driving at such an excessive and dangerous speed, as was estimated, around a down-hill

802

curve with plaintiff's husband in plain view, which would be sufficient to support a substantial part of the verdict. We do not feel that we would be justified in holding, under the facts and circumstances of this case, that the jury abused its discretion or that their verdict was not fair and just.

The judgment is affirmed. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.