MILDRED SOLLENBERGER v. KANSAS CITY PUBLIC SERVICE COMPANY, Appellant.—No. 40061.—202 S. W. (2d) 25.

Division One, April 21, 1947.

Rehearing Denied, May 12, 1947.

*Charles L. Carr, R. Carter Tucker; John Murphy, William H. Wilson* and *Tucker, Murphy & Wilson* for appellant.

456

*A. H. Osborne, Duke W. Ponick, E. E. Thompson,* and *J. H. Greene, Jr.,* for respondent.

458

BRADLEY, C.—Action under the penalty section of our death statute, Sec. 3652 R. S. 1939, Mo. R. S. A., Sec. 3652, to recover $10,000 for the ▇ alleged wrongful death of plaintiff's husband who was killed in a collision between the car which deceased was operating and defendant's bus. Plaintiff (respondent) obtained a judgment for $7500 and defendant appealed. The appeal lies to the supreme court because the constitutional validity of the statute upon which the cause is based is challenged.

Plaintiff pleaded both primary and humanitarian negligence. In the answer defendant challenged the constitutional validity of Sec. 3652, denied the negligence alleged; and pleaded contributory negligence.

Error is assigned: (1) On the refusal of defendant's (appellant's) motion for a directed verdict; (2) on instruction given at the request of plaintiff; (3) on permitting plaintiff to interrogate police officers about a police report and offering the record of the coroner; and (4) on argument.

We will first rule the constitutional question. The original of what is now Sec. 3652 was enacted in 1855. See Vol. 1, R. S. 1855, p. 647, Sec. 2. There have been quite a few amendments. See historical note to Sec. 3652 in Mo. R. S. A., and Clark v. Atchison, Topeka & S. F. Ry. Co., 319 Mo. 865, 6 S. W. (2d) 954, l. c. 960. The con-

stitutional validity of this section has been challenged many times. See notes 1 and 2 in notes to the section in Mo. R. S. A. But never before, so far as appears from the cases in these notes, and in the briefs, and our own research, has the section been challenged on the ground upon which it is now challenged.

Sec. 3652 provides that whenever any person whose death is caused by negligence as in the section provided, the carrier and its offending agent "shall *forfeit* (italics ours) and pay as a penalty, for every such person" a sum of not less than $2,000 and not exceeding $10,000. Our 1875 Constitution, Sec. 13, Art. II, and the 1945 Constitution, Sec. 30, Art. I, provide, in the last two lines of the section, that "when any person shall be killed by *casualty* there shall be no *forfeiture* by reason thereof" (italics ours). Counsel on both sides brief the point on the meaning of the term *casualty* as such term and the term *accident* are frequently used in damage suits arising from collision resulting in property damage or personal injury. But the term *casualty*, as used in the Constitution, does not have reference to such *casualties* as defendant contends. Sec. 13 and Sec. 30 appear in the Bill of Rights of the respective Constitutions and are identical in each. The section follows:

"Treason—Attainder—Corruption of Blood and Forfeitures—Estates of Suicides—Death by Casualty.—That treason against the state can consist only in levying war against it, or in adhering to its enemies, giving them aid and comfort; that no person can be convicted of treason, unless on the testimony of two witnesses to the same overt act, or on his confession in open court; that no person can be attainted of treason or felony by the general assembly; that no conviction can work corruption of blood or forfeiture of estate; that the estates of such persons as may destroy their own lives shall descend or vest as in cases of natural death; and when any person shall be killed by casualty, there shall be no forfeiture by reason thereof." On the subject of treason, attainder, etc., in the Bill of Rights, Constitution of 1820 (Sec. 15, Art. XIII) the language so far as pertinent here was "when any person shall be killed by casualty, there ought to be no forfeiture by reason thereof." The Constitution of 1865 did not contain such provision.

In the debates of the Constitutional Convention of 1875, Honorable Thomas T. Gantt, chairman of the committee on the Bill of Rights (and later a Judge of the St. Louis Court of Appeals), in discussing the term *casualty* in Sec. 13, Art. II, Constitution 1875, said: "The old notion that in death occurring by casualty the property shall be forfeited, not to the State, but to the church as a deodand never had any place in our system and I trust never will." Vol 2, p. 345, Debates Missouri Constitutional Convention, 1875, published by State Historical Society of Missouri. The term *deodand* literally means a thing forfeited to God. In old English law any personal chattel, ani-

mate or inanimate, which became the immediate instrument by which the death of a human being was caused, ▮▮▮ was forfeited to the king to be sold and the proceeds distributed as alms to the poor, all to appease the wrath of God. 18 Corpus Juris, p. 489. In Corpus Juris, there is a historical note on the term *deodand* in which note it appears that. the doctrine óf deodand finally became a scandal graft in England and was abolished by statutes 9 and 10, Victoria, Ch. 62. And the Corpus Juris note goes on to say that the doctrine of deodánd was so repugnant to the American concept of justice that it was not included as a part of the common law of this country. The note cites Parker-Harris Co. v. Tate, 135 Tenn. 509, 188 S. W. 54, L. R. A. 1916F, 935.

In the Tennessee case it appears that Tennessee had a statute providing that when any suit for damages was brought for injuries to persons or property caused by the operation of an automobile in wilful violation of the act, there would be a lien upon the automobile for the satisfaction of the judgment that might be recovered. The principal question in the case was on the superiority of liens between the injured person and the vendor of the offending automobile. In the case the court discussed the doctrine of deodand, set out Sec. 12, Art. I of Tennessee's Constitution which is about the same as our Sec. 30, Art. I, Constitution 1945. The Tennessee section said that ''if any person be killed by casualty, there shall be no forfeiture in consequence thereof'', and specifically provided that there would be ''no deodands.'' It will not be necessary to consider the subject further. It is quite clear that there is no merit in defendant's challenge of the constitutional validity of Sec. 3652.

▮▮ Did the court err in refusing defendant's motion for a directed verdict? The motion was based on the alleged constitutional invalidity of Sec. 3652 and on the alleged insufficiency of the evidence to make a submissible case under the humanitarian rule. Submission was on the hypotheses and in the alternative that the operator of the bus, by the exercise of the highest degree of care, could have sounded a warning, stopped or turned to the right and avoided the collision. We ruled, supra, the point on the constitutional validity of Sec. 3652.

Plaintiff's husband was an Army Major, 30 years old and on terminal leave. January 9, 1946, about 8:30 P. M., he was killed in a collision between the Chevrolet car he was driving and a bus of defendant. The collision occurred in the intersection of Charlotte and 19th streets, Kansas City, Missouri. Charlotte extends north and south and 19th east and west. Defendant's bus approached from the north and deceased from the west. Charlotte is 46 feet, 3 inches in width from curb to curb, and 19th is 35 feet and 8 inches in width from curb to curb, and the intersection was reasonably well lighted and the concrete paving dry. According to plaintiff's evidence deceased approached the intersection on the right hand side of 19th

street; stopped at the stop sign on the southwest corner of. the intersection; then started up; went into the intersection about midway of the south side of 19th street at about 6 miles per hour and increased to 10 or 12 miles to the place of collision in the southeast square of the intersection (considering four squares in the intersection), and about 22 feet south of the north curb of 19th street, and about 10 feet west of the east curb of Charlotte. There is an eight percent up-grade from the intersection south on Charlotte. The bus, after the collision and before stopping, according to plaintiff's evidence, went up the grade some 70 feet. The Chevrolet was knocked south, turned to head south, and struck the corner of a building on the southeast corner of the intersection. The bus carried no passengers; it was marked "special", and was going to the barn.

The bus, according to plaintiff's evidence, was, at the time deceased entered the intersection, about 70 or 75 feet north of the intersection and traveling 20 to 25 miles per hour on the street car rails (track) and continued to the point of collision at about the same speed without sounding a warning and without turning to the right or left. The left front of the bus hit the left front door of the Chevrolet by which door deceased sat, and so far as appears plaintiff's husband was instantly killed.

Plaintiff's evidence as to stopping the bus was that under the conditions and traveling at 20 miles per hour it could have been stopped with safety to equipment and anyone on it in 31 to 32 feet and at 25 miles in 40 feet. If the bus was 75 feet north of the intersection when the Chevrolet entered, then the bus traveled thereafter to the point of collision a distance of about 97 feet. In the same time the Chevrolet traveled across the west half of Charlotte 21-5/8 feet plus 11-5/8 feet on the east half of Charlotte, or a distance of 33-1/4 feet. As stated, the Chevrolet started up at about 6 miles per hour and increased to 10 or 12. If we say 10 and take the average of 6 and 10, which is 8, then the Chevrolet traveled at an average of approximately 12 feet per second or the distance of 33-1/4 feet in approximately 2-3/4 seconds. If the bus was traveling at 25 miles per hour, approximately 37-1/2 feet per second, and was 75 feet north of the intersection when the Chevrolet entered, then the bus covered the 97 feet to point of collision in 2-44/75 seconds, or approximately 2-2/3 seconds. The difference in arriving time to point of collision is slight.

There is a wide margin between the evidence offered by plaintiff and that offered by defendant as to when the Chevrolet and bus entered the intersection, and on speed of both and on almost all vital questions. Defendant's evidence was that the Chevrolet did not stop at the stop sign, but entered the intersection "at a fast rate of speed" after the bus had entered, and that the bus entered at about 12 miles per hour on the west side of Charlotte; that immediately upon the Chevrolet entering the intersection the bus horn was sounded and

the brakes applied; that the bus stopped, after the collision, when the front end was about even with the south curb of 19th street. But when a verdict is for the plaintiff we take the plaintiff's evidence as true when not entirely unreasonable or opposed to physical laws and give plaintiff the benefit of all favorable inferences arising from all the evidence, and disregard defendant's evidence where it conflicts with plaintiff's or fails to strengthen plaintiff's case. Trower v. Missouri-Kansas-Texas R. Co., 347 Mo. 900, 149 S. W. (2d) 792, 795 (2); Young v. Wheelock et al., 333 Mo. 992, 64 S. W. (2d) 950, l. c. 953, (4-11).

Defendant contends that there was no substantial evidence to support submission on either of the alternatives and especially on turning to the right. In the brief defendant says: "No case was made for the jury under the charge that the operator could have changed the course of the bus to the right and have avoided the collision because, among other reasons, there isn't a scintilla of evidence in the entire record relative to the distance the operator would have had to be from the point of collision in order to have swerved his bus sufficiently to have avoided contact with the Chevrolet."

The Chevrolet was 16 feet, 2 inches in length, and according to plaintiff's evidence, it was 20 or more feet from the rear of the Chevrolet to the west curb of Charlotte at the moment of collision. There was no other traffic in the intersection; no cars parked on the west side of Charlotte. The operator of the bus concedes that he saw the Chevrolet enter the intersection, but as stated, he says that the bus had then entered and that he had no time to turn, but according to plaintiff's evidence the operator of the bus could have seen the Chevrolet enter the intersection before the bus reached the intersection, and could have seen the Chevrolet continue at an increasing speed with no indication, judging by his conduct, that the deceased was aware of the approach of the bus. As stated, the left front of the bus hit the left front door of the Chevrolet. This would be somewhat near midway of the Chevrolet, and about 10 feet from its rear. The Chevrolet, at the moment of collision, was moving 12 miles per hour, approximately 18 feet per second. Considering the distance from the intersection that the bus was when the Chevrolet entered the intersection, according to plaintiff's evidence, and considering plaintiff's evidence as to distance in which the bus could be stopped and the clear space to the right, it was proper to submit the cause on all three of the alternative hypotheses, and defendant's motion for a directed verdict was properly refused. Heitz v. Voss Truck Lines et al. (Mo. Sup.), 175 S. W. (2d) 583; Bootee v. Kansas City Public Service Co., 353 Mo. 716, 183 S. W. (2d) 892.

Plaintiff's instruction No. 1 is challenged for the same reasons as in the motion for a directed verdict. We have ruled the constitutional question and have held that plaintiff made a submis-

sible case under the humanitarian rule as submitted. But defendant again complains on submitting the turning to the right. That question, too, was ruled. And we might say that defendant did not make this objection to instruction No. 1 at the time of considering objections to instructions under Rule 3.21. For defendant's duty under Rule 3.21 see Coogan v. Nighthawk Freight Service (Mo. App.), 193 S. W. (2d) 388, l. c. 390.

Plaintiff's instruction No. 2 was on the measure of damages. The complaint on the instruction is based on the constitutional question which has been ruled.

Four police officers were called as witnesses by plaintiff and identified the police reports of the collision resulting in the death of plaintiff's husband. Defendant, at the outset of inquiry about the police reports, objected to the offering in evidence of these reports and they were not admitted. Plaintiff did, however, offer the record of the coroner's office about the death of plaintiff's husband, but the offer was refused. Defendant says that these inquiries and the offering were "gestures" made to compel objections by defendant and thus prejudice the jury, "sow the seeds of suspicion" that defendant was endeavoring to conceal "damaging evidence." If plaintiff's inquiries and offering were "window dressing", as defendant implies, such, it would seem, fell on deaf ears, so far as concerns the amount of the verdict, because the verdict was $2500 less than it could have been and it is not likely that such inquiries and offering influenced the jury on the facts.

Five objections were made on the closing argument of plaintiff's counsel. We set out the argument complained of in separate numbered paragraphs with the objections and the rulings. In each instance defendant moved for a mistrial which was denied. The argument, objections, and rulings follow:

(1) "You men are not made of sticks and stone; you are not dummies; you heard this evidence and you know exactly what is going on here. In a court of justice you have to follow rules of evidence. A lot of things I can't tell you here. I want you to think and think and think. You know exactly what is going on here. Now, I never thought, Mr. Tucker (counsel for defendant), because a lawyer wore a good suit of clothes and represented a corporation that he had any more rights in a court of justice than anybody else." Defendant's objection was, "We object to that argument as appealing to the passion and prejudice of this jury." The court directed the jury to disregard "the statement."

(2) "Gentlemen of the jury, he (counsel for defendant) says that only in the most aggravated case you should bring in a verdict for $10,000.00. Why, this is the most aggravated case a man could have. The testimony is this Major (deceased) went overseas and served his country well, and his wife is in here asking for justice—." At the

close of this statement defendant's counsel said: "We again move that counsel be reprimanded and the jury instructed to disregard the argument with reference to this man's military service." The court directed the jury to disregard the military service of deceased, stating that such was admitted in evidence only to show earning capacity and occupation.

(3) "This man (defendant's counsel) says, 'Osborne (plaintiff's counsel) tells you falsely.' Have I told you anything falsely? He stood up here in his argument, he didn't know why his operator didn't see that other car. He was so excited that the truth slipped out. You can push the truth down, but it won't stay down. Gentlemen of the jury, bring in a verdict for $10,000.00 and don't speculate on its future. Please leave that to me. Gentlemen of the jury, in deciding how much you are going to give in your verdict—the court uses the word, very wisely, he says, 'in the discretion of the jury'—in your discretion you may take into consideration the pecuniary loss, show the loss of earning power. Year after year that man (deceased) would have brought in money, and his children have a right to an education, and they certainly do not have a right to have this man's life snuffed out on a public street—." The objection was, "I object to that and move that the jury be ▮▮▮ instructed to disregard it." The objection was overruled.

(4) "Here is something else I want you to think about: That witness Reese (plaintiff's witness) that testified here, he is a working man. He has got a family. He was under cross examination and this lawyer used every tactic in the world, but did he impeach him? And he asked the witness before this jury to remain here, and he made him remain here until after lunch today. It is in the record of this case. He penalized that witness. Why? Because he didn't want him to testify against the street car company. He didn't like that testimony from the witness stand. He heard it and he couldn't impeach him and he didn't like it. He wants to penalize him, and he did, and you all know that he penalized him." The objection was that "the jury be instructed to disregard that prejudicial argument as improper", and "outside the record." The objection was overruled.

(5) "Gentlemen of the jury, I submit to you men if the witness (Reese) was not released from the witness stand and asked to remain here and not to leave in front of you men, and he was not released by this court until after lunch today, and it is in the record here. I say to you, they penalized that witness by making him come back here." The objection was that the argument was repetition, and unfair; that a lawyer has the right to have a witness wait until he is through with him. The court directed the jury to disregard the argument as to the witness being penalized.

It will be noted that the objection to the argument in paragraph (1) came after the reference to the lawyer who wore good clothes and represented a corporation. Only the argument complained of is set out in the record, except one paragraph on which there is no complaint in the brief. We are unable to hazard a guess as to what the argument had reference to, but the court directed the jury to disregard whatever was aimed at by the objection. And as to the argument in paragraph (2) the court directed the jury to disregard the military service of deceased, and told the jury why evidence of such was admitted. As to the argument in paragraph (3), the objection, "I object to that" is not an adequate objection. Gary et al. v. Averill et al., 321 Mo. 840, 12 S. W. (2d) 747, l. c. 749, 750, and cases there cited.

The argument in paragraphs (4) and (5) is on the same subject and may be considered together. Robert A. Reese, an employed steam fitter, was one of plaintiff's two witnesses who saw the collision. Reese testified on the first day of the trial, and at the conclusion of his evidence defendant's counsel said that he did not want "this witness excused at this time." The trial was finished next day, but Reese was not called for further cross examination. It is not likely that the jury was adversely affected by argument about Reese, besides the court directed the jury to disregard the argument about Reese being penalized. The trial court, in effect, sustained all objections, except as to paragraph (3), and there the objection was insufficient. We do not think that defendant has grounds for complaint on argument, including that in paragraph (3) where the objection, though insufficient, was overruled. Marlow v. Nafziger Baking Co., 333 Mo. 790, 63 S. W. (2d) 115, l. c. 120. See also, Evans v. Town of Trenton, 112 Mo. 390, 20 S. W. 614.

Finding no error, the judgment should be affirmed. It is so ordered. *Dalton* and *Van Osdol, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.