CHARLES KELSO v. W. A. ROSS CONSTRUCTION COMPANY, a Corporation, and M. J. ROSS, Administrator of the Estate of W. A. ROSS, who was formerly engaged in the business under the name of W. A. ROSS CONSTRUCTION COMPANY, Appellants.—85 S. W. (2d) 527.

Division One, July 9, 1935.*

*NOTE: Opinion filed at September Term, 1934, February 8, 1935; motion for rehearing overruled April 17, 1935; motion to transfer to Court en Banc filed; motion overruled at May Term, July 9, 1935.

*Harris & Koontz* for appellants.

*Cowgill & Popham* and *John F. Cook* for respondent.

208

HYDE, C.—This is an action for damages for plaintiff's personal injuries caused by a truck, owned by his employer W. A. Ross, backing against him. There were two trials in the circuit court. In the first trial, plaintiff obtained a verdict for $20,000 which was set aside by the court as against the weight of the evidence. In the second trial, plaintiff had a verdict for $15,000 and judgment was entered thereon against both defendants. From this judgment both defendants have appealed.

Before considering the merits of this case, it is necessary to decide the defendants' contentions that the plaintiff's cause of action did not survive the death of his employer, W. A. Ross, and

that the corporate defendant was not liable because it was not in existence at the time of plaintiff's injury. Plaintiff was injured June 2, 1926, at which time his employer W. A. Ross was an individual paving contractor operating under the name of W. A. Ross Construction Company. Plaintiff's suit was commenced June 28, 1928, evidently, as shown by the sheriff's return, upon the theory that the W. A. Ross Construction Company was a corporation. Whether the Construction Company was incorporated at that time or was incorporated after the death of W. A. Ross, as recited in the court's order of revival, hereinafter set out, defendants, because of their conduct and agreements and the state of the record before us, cannot on this appeal now question the finding of the trial court that W. A. Ross was before it as a defendant in this case during his lifetime, or that the present corporation W. A. Ross Construction Company is liable for plaintiff's injuries, if W. A. Ross was liable, for the following reasons. The sheriff's return states that he executed the original writ of summons by leaving a copy thereof, and a copy of the petition, with "W. A. Ross as President and chief officer of the within named defendant corporation." Plaintiff says that the original petition, having been abandoned and not offered in evidence, is not before us. This is true (Spotts v. Spotts, 331 Mo. 917, 55 S. W. (2d) 977, and cases cited), but the original summons and return is before us because it is a part of the record proper. [Brown v. Langlois, 70 Mo. 226; Madison County Bank v. Suman's Admr., 79 Mo. 527; Reed v. Nicholson, 93 Mo. App. 29.] However, at the September Term, 1928, a motion to make more definite was filed and overruled and an answer was then filed. This was certainly not done by the corporate defendant if it was not then in existence, as recited in the court's order of revival.

W. A. Ross died June 30, 1929. Almost a year later, on June 4, 1930, the following order was entered by the court, by agreement of counsel, to-wit:

"This cause coming on to be heard touching the matters herein, and the death of W. A. Ross having been suggested, and this action having been instituted against W. A. Ross Construction Company. then referred to as a corporation, but being merely a business owned and operated by W. A. Ross, doing business as W. A. Ross Construction Company, and *W. A. Ross* having been duly served and *having entered his appearance and having been duly before the court herein,* now comes plaintiff and asks that M. J. Ross, Administrator of the estate of W. A. Ross and *the W. A. Ross Construction Company, now a corporation, subsequently organized by said administrator and said estate for taking over and operating deceased's said business* be joined as parties defendant and that this cause as to W. A. Ross be revived against his said administrator, M. J. Ross, which is done, and plaintiff tenders first amended petition and joinder and comple-

tion of parties, and thereupon said defendants M. J. Ross, Administrator, so substituted as a defendant instead of decedent W. A. Ross, and the W. A. Ross Construction Company, a corporation, enter their general appearance herein and waive service of process, and request leave and by agreement are granted and given by the court ten days to file answers herein." (Our italics.)

Pursuant to this order plaintiff filed an amended petition which stated the facts contained in the order and alleged that after the death of W. A. Ross, the administrator of his estate, "said M. J. Ross, caused said business and properties and assets to be gathered together, and said business to be continued and incorporated under the name of W. A. Ross Construction Company, and said company and said business is now so incorporated, and doing business under said corporate name, and is responsible and said administrator is responsible for all the obligations incurred in and arising out of the conduct of said business by assumption and by operation of law and by the taking over of the assets of said company and said business, *which obligations include the claim of plaintiff herein sued upon.*" Separate answers were filed on behalf of the administrator, each of which merely contained a general denial and a plea of contributory negligence.

At the close of plaintiff's evidence, defendants offered separate peremptory instructions each of which directed a verdict only as to that defendant and did not mention the other. When these instructions were offered plaintiff's counsel inquired about a stipulation which he claimed had been made at the former trial as to the assumption of obligations, and after some discussion about whether there had been such a stipulation, plaintiff called M. J. Ross as a witness. He stated that he was the president of the corporate defendant; that it took over all of the property of W. A. Ross Construction Company, which had been operated by W. A. Ross, and "continued the same business under an incorporated name that theretofore had not been incorporated;" that all outstanding debts were paid; that the corporation's minute book showed what was assumed and whatever was done; and that he did not remember and could not say "as to what the records may disclose." When there was thus no definite understanding about a stipulation, the court directed that the minutes be produced, and plaintiff rested with the announcement of his intention to use the minutes "for the purpose of the record."

However, at the end of the day just before adjournment, the following agreed statement of facts was read into the record, namely:

"It is stipulated and agreed that the W. A. Ross Construction Company as operated by W. A. Ross as an individual was incorporated under the name of W. A. Ross Construction Company, a corporation, took over all of the assets of the W. A. Ross Construction

Company as operated by W. A. Ross individually and *assumed all of the obligations of the W. A. Ross Construction Company* as operated by W. A. Ross individually.''

It is significant that, while at the close of plaintiff's evidence, defendants each separately requested peremptory instructions, at the close of the whole case, after the stipulation as to assumption of obligations above quoted was made, defendants did not again ask separate peremptory instructions, but jointly asked for a directed verdict; and that in submitting the case, the court instructed the jury, as follows:

''The court instructs the jury that it is shown and conceded of record in this case that W. A. Ross was conducting the work and business under the name of W. A. Ross Construction Company and said business was later incorporated under the name of W. A. Ross Construction Company and that said business and assets were thereby taken over and afterwards the business was and is now operated by and as W. A. Ross Construction Company, a corporation, and said company would in law be responsible for the acts and negligence, if any, on the part of the then employer of plaintiff as submitted in these instructions, and therefore if your verdict is for plaintiff it will be against both defendants in accordance with forms of verdict given you in a separate instruction.''

It is also to be noted that there was no instruction asked by defendants, or either of them to authorize the jury to find against one defendant and not against the other. The forms for verdict, given to the jury, were limited to two, as follows: ''We, the jury, find the issues for plaintiff and against defendants and assess his damages at $————;'' and ''We, the jury find the issues for defendants.'' All other instructions offered by defendants referred often only to ''the defendant'' and those which authorized a verdict closed with the statement, ''Your verdict must be for the defendant,'' without any attempt to distinguish between or separate the liability of one defendant from the other. It is not to be overlooked either that, if the corporation was organized, after the death of W. A. Ross, by the administrator of his estate for the purpose of taking over from his estate his construction business and that plaintiff's suit was then pending, it was then in effect a demand against his estate. [Sec. 184, R. S. 1929.] Having made this stipulation, under the circumstances discussed, in lieu of producing the minutes of the corporation, which would have shown what was assumed, defendants cannot now be heard to contend for a technical meaning of the word ''obligations,'' which would not include the obligation to pay plaintiff's claim if it was duly established as a liability of W. A. Ross arising out of his construction business.

It is also clear that plaintiff's suit, having been commenced before the death of W. A. Ross, comes within the provisions of Section 3280,

Revised Statutes 1929, and did not abate when he died. It is true that the suit named the W. A. Ross Construction Company and originally proceeded upon the theory that it was a corporation, when according to the order of revival there was no such corporation in existence. However, it was recognized by the parties when the agreed order, above referred to, was entered that the suit was against W. A. Ross; that he had entered his appearance therein; and that the cause should be revived against his administrator. We, therefore, rule against defendants upon their contentions as to the liability of the corporate defendant and the administrator for plaintiff's claim against W. A. Ross, because we find that these matters were not controverted issues when the case was submitted below; and we will proceed to consider the merits of this appeal. Having determined that the corporate defendant is liable if W. A. Ross was liable, we will hereinafter refer to plaintiff's employer as the defendant; and since defendants contend that the court should have sustained their demurrer to the evidence, we will state the facts which plaintiff's evidence tended to show when viewed most favorably to plaintiff.

In June, 1926, at and prior to the date of plaintiff's injury, the defendant, under a contract with the State Highway Department, was paving State Highway No. 13 from U. S. Highway No. 40 north to Higginsville. The material for this work was shipped on the C. & A. Railroad to Higginsville, trucked out about two miles south from there, and piled in the highway. The crushed rock pile (1¼ inch rock) was farthest north, nearest Higginsville. About two or three hundred feet south of the rock pile was the sand pile and near it, the cement dock. The rock was hauled from the railroad yards in two and one-half ton Mack trucks. They were referred to as "rock trucks." There were smaller trucks called "batch trucks," which operated between the material piles and the concrete mixer, which was kept at the point where the paving was being laid. They were loaded with a measured amount of rock, sand and cement which they took several miles south to the mixer. They were not driven north of the rock pile, but received their rock there from a rock loading machine called a Barber-Greene. This machine operated on a caterpillar tread and was pushed into the rock pile, where, by means of buckets on a conveyor, the rock was shoveled from the rock pile and carried into a hopper at the rear of the machine. The batch trucks drove under this hopper and got their loads of rock. The Barber-Greene worked back and forth, east and west, across the south end of the rock pile. When it had shoveled away the west part of the south side of the pile, the rock trucks coming from Higginsville were dumped to the west of where the Barber-Greene was working. If it had shoveled away the east part of the south side of the rock pile and was working back toward the west side, the rock

trucks were driven around behind it and dumped on the east side of it.

Plaintiff was working on the rock pile and it was his duty to spot the trucks, that is, to show them where to dump their loads. He would indicate where they were to unload by holding his shovel at that point. The truck would then be backed into the pile and the driver would raise the front end of the truck bed by means of a power hoist operated from the motor of the truck. Plaintiff would open the end gate from his position on the rock pile and the rock would slide out. He was expected to keep the rock piled as high as possible because it was easier for the Barber-Greene to take rock out of a high pile. It was also his duty to remove any boards, iron or other trash from the rock, which any truck unloaded with its rock, so that it would not get into the batch trucks and be taken to the concrete mixer. He also shoveled loose rock up onto the pile so as to keep the pile as high and steep as possible. The pile was estimated to be from seven to ten feet high and came a few feet west of the center of the roadway which was sixty feet wide, with side ditches beginning six feet out from the fences, so that the built-up part was forty-eight feet wide between the banks of the ditches. The roadway was graded earth. The paving was to be an eighteen-foot slab with shoulders six feet wide.

There were ten rock trucks, which were supposed to come at regular intervals, but sometimes they would bunch up and several of them would come together. When a truck was dumped and pulled away plaintiff would slide down the rock pile and remove any foreign matter from the rock before it was shoveled up by the Barber-Greene and he would then get back on top of the pile and spot the next truck. Sometimes the rock trucks, after being dumped, would drive on south of the rock pile beyond the Barber-Greene and turn around between the rock pile and the sand pile. At other times, they would turn on the west side of the rock pile by going forward across the road until their front wheels went into the roadside ditch and rested against its west bank and then would back east again, with the front wheels cramped as much as possible so as to throw the rear end of the truck to the south, until it could be driven on north without going south of the rock pile to turn around. Apparently, it depended upon where they backed into the rock pile and how far the rock pile extended beyond the middle of the road whether trucks could be turned around by backing only once. When the trucks were dumped the front end of the truck bed was elevated above the top of the driver's cab so that until it came back down into place the driver could not see behind him. Plaintiff's evidence tended to show that, when the trucks came in bunches, it was necessary for him to come down from the pile to remove foreign matter from the rock before it was covered by the load of another truck

or was shoveled up by the Barber-Greene; and that he would have to turn his back to the trucks in order to watch the discs of the Barber-Greene when he was working close to it picking up this material.

The foreman who had charge of loading the rock trucks and building the rock pile was Raymond Frost. Defendant raises a question as to whether he was plaintiff's foreman. Frost said: "I kept his time, I don't think I put him to work. I guess I was his foreman. . . . I suppose that would go in with stock piling. . . . Mr. Kelso was on my job out there. . . . I had authority to see that the rock got out there and was piled, piled up right." Plaintiff testified that Raymond Frost was his foreman, put him to work on the rock pile and supervised his work there. Plaintiff said that he called Frost's attention to the situation, created by the bunching of the trucks. Plaintiff said: "They commenced backing pretty frequently and I said, 'Raymond, this is a little dangerous. A man is liable to get hurt.' He said, 'No, Dad, don't let that worry you.' He said 'You are perfectly safe here.' He said, 'Whenever one of these truck drivers or any of them are to back up they are to warn you.' He says, 'I have instructed them to warn you if they are intending to back up.' "

Plaintiff testified that some of the drivers did warn him when they were going to back up against the pile by leaning out and "hollering" at him and that a few times he was warned by the sounding of a horn, but that only one or two of the trucks had horns in operating condition. When the Barber-Greene was in operation, it made so much noise that it was difficult to hear anything else. No instructions, about backing, where to turn around, or about warning plaintiff, were ever given to any of the rock truck drivers by the foreman, but they were left to turn around at any place and in any manner they chose, without paying any attention to plaintiff who was thus left to look out for himself.

On the day plaintiff was injured, Maurice Frost, a brother of the foreman, drove up with a rock truck. Plaintiff said that he had him dump his load at the southwest corner of the pile and that his truck was headed almost directly southwest when it was dumped. The Barber-Greene was then working about seven or eight feet east of the middle of the roadway. Plaintiff saw a piece of two-by-four and some splinters in the rock, which Frost had dumped. As Frost drove his truck away from the pile, plaintiff slid down the side of the pile, and facing toward the pile and the Barber-Greene, reached with his hand to within about four feet of the discs of the Barber-Greene and was picking up the splinters, when Frost's truck, backing up, struck him, pushed him into the rock pile and injured him. There was conflicting evidence as to whether Frost was able to then drive on north or whether he had to back a second time before he

could do so. He did not know that he had struck plaintiff until he had driven about 100 feet away from the place where he turned. He said that he was in a hurry; that "it was pretty close to noon . . . getting close to quitting time and I wanted to get back in by noon." There was another truck (Perry's) which had dumped just before Frost's and was turning around south of the Barber-Greene between the rock pile and the sand pile at the time of the accident. Perry said he thought he "hauled the last load on the south side . . . went around below the Barber-Greene and unloaded." He also said that "not until after the accident" did he ever go below the Barber-Greene to turn around when he "unloaded back into the west side north of the Barber-Greene." Plaintiff was picked up by the operator of the Barber-Greene, taken to a doctor at Higginsville and was later sent to a hospital in Kansas City.

The evidence was conflicting about the amount of space there was in the roadway between the west bank of the side ditch and the west side of the rock pile and as to whether or not a rock truck could back straight into the pile in one movement by cramping its front wheels so that it would be straight east and west across the road in such a position that, after dumping, it could turn to the north as easily as to the south. Plaintiff's evidence tended to show that the trucks could only back into the west side of the rock pile at an angle and would be headed southwest; that they would usually be driven on south of the rock pile and be turned around between the rock pile and the sand pile; and that they could only turn around, on the west side of the pile, by backing once, when the Barber-Greene had shoveled out a hole in the west side of the rock pile. Defendant's evidence, however, tended to show that "the space between the center of the road to which the pile extended, and the bank on the west side of the road was 15 to 18 feet;" that "to back in straight in the pile, the driver drove up to the point where the load was to be unloaded, cramped his wheels to the right as far as possible, and went forward as far as possible, and then cramped his wheels back toward the north to throw his truck in a straight east and west direction, and then backed into the pile;" that "to go back north from this position, it was necessary for the driver to cramp his wheels as far as possible to the north and then drive his car westerly or north-westerly as far as possible and to then cramp his wheels back towards the west and throw the front end of his truck to the north and back;" and that this would "get his truck into a position to go on north back to Higginsville." Defendant's evidence also tended to show that the rock trucks were usually unloaded on the west side of the rock pile; that they did not go between the rock pile and the sand pile to turn around; that to do so would make it necessary for them to cross between, and interfere with, the batch trucks, both as they were coming from the south to be loaded at the Barber-Greene and as they

were going back from it on their way to the concrete mixer; and that plaintiff was not expected to and usually did not get down from the top of the rock pile to remove trash until after each truck had turned around and driven away from the pile. Defendant's foreman Raymond Frost denied that he had a conversation with plaintiff about a warning and denied that he ever told plaintiff that he would instruct the rock truck drivers to warn him.

Defendant contends that its demurrers to the evidence should have been sustained. Its demurrers at the close of plaintiff's evidence were, of course, waived by proceeding with its own evidence instead of standing on them. The only demurrer before us is the one overruled at the close of all the evidence. Defendant's contentions are that there was no showing of any negligence on its part; that plaintiff was guilty of contributory negligence as a matter of law; and that, if his injury was due to negligence on the part of anyone other than himself, it was the negligence of a fellow servant for which defendant was not liable. Plaintiff seeks to base his cause of action upon nondelegable duties with reference to the safety of the place and the method in which the work was done there. Since negligence in a master and servant case depends upon the existence of a duty on the part of the master "the ultimate question to be first determined in every case is whether the master is guilty of a breach of duty to the servant who brings the action." [3 Labatt's Master & Servant, 2390, sec. 898.] "The general standard of care, by which the duty of an employer is determined, is that required of everyone in all relations with others, namely: The reasonable care of the average prudent person under similar circumstances. . . . The more specific duties which arise from the general duty of an employer to use reasonable care are: To see that the place of work is reasonably safe; to see that suitable instrumentalities are provided; and to see that those instrumentalities are safely used." [Schaum v. Southwestern Bell Tel. Co., 336 Mo. 228, l. c. 234, 235, 78 S. W. (2d) 439.] These nondelegable duties are duties of the employer to his employees and not of fellow servants to each other. These duties are all closely related, and often concern matters beyond the control of individual employees. As pointed out by Labatt (Vol. 3, p. 2391, sec. 899), the place in which the work is done cannot always be separated from the instrumentalities with which the work is done and "it is often difficult, if not impossible, to say with confidence which of these two conceptions is appropriate to the facts in evidence." For example, "a locomotive, which is clearly a piece of machinery so far as the engineer and fireman are concerned, is just as clearly something which makes the place of work unsafe as regards a trackman who is run down by it." Thus the manner in which instrumentalities are used may make a place safe or unsafe as a place of work, and, therefore, the duty to see that instru-

mentalities are safely used may become the most important element in the safety of a workman in his place of work. In construction work where conditions are constantly changing the duty of providing a safe place of work cannot be imposed to the same extent as in the case of work done in a more permanent location because, under these conditions, it is impossible to keep the place of work, the actual physical location in which the work is done, as safe as a place in a completed structure. [Cain v. Humes-Deal Co., 329 Mo. 1107, 49 S. W. (2d) 90; Meehan v. St. L., M. & S. E. Railroad Co., 114 Mo. App. 396, 90 S. W. 102, 60 A. L. R. 405, note; 39 C. J. 351, sec. 470; 18 R. C. L. 595, sec. 96.] This is, perhaps, only another way of saying that the lack of safety of such a place of work, arising from the conditions created by carrying on the construction, is one of ordinary risks of employment therein, which are not created by the employer's negligence, and for such risks the employer is not liable. [Goodwin v. Missouri Pacific Ry. Co., 335 Mo. 398, 72 S. W. (2d) 988; Schaum v. Southwestern Bell Tel. Co., 336 Mo. 228, 78 S. W. (2d) 439.] However, in such work not only is the danger of the place of work itself greater because it is shifting and changing, but there is usually also greater danger from the use of instrumentalities with which various phases of work is carried on by other employees. It, therefore, seems reasonable that the duty to provide a safe method of carrying on the work, by providing that the instrumentalities with which it is done shall be safely used, should increase, as the duty with regard to the place in which the work is done decreases because the employee is not working in a permanent place which can more easily be provided with safe physical surroundings. A safe method of doing the work is something that the employer can provide to safeguard his employees from some risks of the shifting and changing of physical surroundings of the place of work, and the use of the required instrumentalities therein; and when it is necessary for their protection, in the exercise of reasonable care, it should be held to be a part of his duty to them and his failure to perform it is negligence. In other words, the employer's duty is not merely safety of the place of work of his employee, but also his *safety in his place of work;* in short, a safe environment as well as a safe place.

This duty is performed by providing a safe method of work, and it properly arises from circumstances where an employee cannot safely look out for himself because of the complexity of the operations under way. "One who employs servants in complex and dangerous business ought to prescribe rules sufficient for its orderly and safe management." [Reagan v. St. L., K. & N. W. Railroad Co., 93 Mo. 348, 6 S. W. 371; Haggard v. Union Depot B. & T. Co., 302 Mo. 19, 256 S. W. 783.] "The chief circumstance upon which the duty to do this depends is that the business is an intricate and complex

one in which different workmen or groups of workmen have distinct tasks, and one group in the performance of its tasks is liable to endanger the safety of some other group engaged in a different task.'' [Jacob v. Peerless White Lime Co., 327 Mo. 868, 40 S. W. (2d) 556.]

"The distinctive and characteristic elements of the duty to see that instrumentalities are safely used are obviously: (1) General orders issued for the guidance of servants. (2) Particular orders with reference to the details of the work during its progress. As regards general orders, the master may be conceived to be subject to three obligations: (1) To frame suitable rules and regulations. (2) To bring those rules and regulations to the knowledge of the servants for whose benefit they are framed. (3) To carry out those rules and regulations in such a manner that the objects for which they are framed may be attained. But it is obvious that, in practice, the responsibility of the master in respect to the second and third of these obligations—more especially the third—is considerably diminished by the operation of the doctrine of common employment. . . . Except in the cases in which the master is himself directing the work in hand, his obligation to protect his servants does not extend to protecting them from the transitory risks which are created by the negligence of the servants themselves in carrying out the details of that work. In other words, the rule that the master is bound to see that *the environment* in which a servant performs his duties is kept in a reasonably safe condition is not applicable where that environment becomes unsafe solely through the default of that servant himself, or of his fellow employees. It is obvious that this is merely an alternative way of stating the effect of the doctrines of contributory negligence and common employment.'' [3 Labatt, pp. 2395 and 2398.]

However, an obligation of the employer to warn employees of certain transitory dangers under some circumstances, does arise "out of the duty to conduct the business on a safe system.'' [3 Labatt, 2930, sec. 1112, also Chap. XLIX.] "One very common aspect of the duty to provide a safe system is presented in those cases in which the gravamen of the complaint is a breach of the obligation to warn a servant against perils arising from the manner in which the instrumentalities are affected by isolated events which occur at more or less frequent intervals during the performance of the servant's work, but which produce no permanent effect upon the intrinsic condition of the instrumentalities themselves. The distinctive features which is common to actions to recover for injuries caused by such perils is that the environment of the servant undergoes some temporary change. . . . Where the employer has adopted a system for the purpose of notifying servants of the approach of a certain kind of transitory or sporadic danger (here the evidence is that this was promised), it is plain that the fact of the servant's having relied on

the receipt of the customary warning (here the evidence is also that some drivers had warned plaintiff which would lead him to believe that they had been instructed), and being thus induced not to keep as careful a watch as he would otherwise have kept, constitutes a specific and additional reason for holding the master liable for injuries which may result from the omission to give the warning on some particular occasion." [3 Labatt, pp. 2929-2936, sec. 1112; as to fellow servant's failure to give warning or signal being the sole cause of injury under ordinary circumstances see 4 Labatt, secs. 1531 and 1537.] "A master's duty does not end with prescribing rules calculated to secure the safety of employees. It is equally binding on him honestly and faithfully to require their observance." [3 Labatt, 2962, sec. 1120.]

Applying these principles to the facts in this case, considered most favorably to plaintiff, we find plaintiff in a situation where his working place alternated between the top of the rock pile, where he was safe from the instrumentalities used in the work, and on the ground in front of or at the side of the pile, where certain instrumentalities (the trucks) were moved at intervals through his place of work and where he had three things to attract his attention; he had to look for trash and remove it, he had to watch the movements of the Barber-Greene, and he had to keep out of the way of the trucks. If he had to look at the pile to find the trash and pick it up, and if he had to keep an eye on the Barber-Greene to keep from being caught and drawn into its relentless machinery, obviously he could not always also observe all the movements of the trucks passing, backing, or turning behind him. Either arrangements for a warning to plaintiff before backing over the place where he was required to work or instructions to the drivers to turn around south of the rock pile rather than on plaintiff's place of work would have eliminated all danger of plaintiff's being struck by a truck. Was defendant's business, there under way, "an intricate and complex one in which different workmen or groups of workmen *had* distinct tasks, and one group in the performance of its tasks *was* liable to endanger the safety of some other group engaged in a different task," so that some system put into effect by "rules (or instructions) sufficient for its orderly and safe management" was necessary to keep the environment, in which plaintiff was required to work, reasonably safe? "If there is any evidence which tends to show that the system of work adopted by the defendant was an improper one, it is error to dismiss the action." [3 Labatt, 2921, sec. 1110.] We hold that under the evidence, this was a question for the jury. This being true, the jury could properly find that defendant was negligent in failing to provide for a safe method of using the instrumentalities, with which it required the work to be carried on in and about the place where plaintiff was required to work because (as required to be

found by plaintiff's Instruction. No. 1) "under the methods of his employer in conducting said work and in the performance of plaintiff's duties in such assorting his said working place was dangerous and not reasonably safe, for plaintiff so to do, unless he was warned of such backing of such truck," especially if his foreman "ordered plaintiff to do said assorting and . . . . assured him that while doing said assorting he would be warned of the backing of trucks." They could also find that such a failure to provide a safe method of work or the failure of his foreman to put it in operation directly contributed to cause plaintiff's injury; and that it was not solely caused by the negligence of plaintiff's fellow servant, the truck driver. In other words, there was substantial evidence to show that plaintiff's environment became unsafe because of a default of his employer and not solely through the default of his fellow employee. The fellow servant rule is said to be "a departure from the ancient rule of *respondeat superior*." [18 R. C. L. 715, sec. 194.] Therefore, many exceptions are recognized in its application, and one of them is that negligence of a fellow servant is not a defense available to an employer whose own negligence contributes directly therewith to cause an employee's injury. [Cain v. Humes-Deal Co., 329 Mo. 1107, 49 S. W. (2d) 90, and cases cited; Wack v. Schoenberg Mfg. Co., 331 Mo. 197, 53 S. W. (2d) 28; 18 R. C. L. 717, sec. 196; 39 C. J. 675, sec. 798.]

It is likewise clear that we cannot sustain defendant's contention that it was contributory negligence, as a matter of law, for plaintiff to come down from the rock pile before Maurice Frost's truck had turned and driven away. This was also a jury question. If plaintiff's evidence is taken as true, he was assured by his foreman that the truck drivers would warn him before backing toward the place where they had dumped, which meant that they would look out for him in backing where he was expected to work. If plaintiff was expected to see that boards were not shoveled up by the Barber-Greene, and if, as he said, the Barber-Greene was shoveling close to the place where these boards and splinters were deposited when Frost's truck was dumped, it may have reasonably seemed necessary for plaintiff to act at once, and that if he did not slide down and remove it, the Barber-Greene might get it or it might be covered up by rock which it caused to slide over it. The jury also had a right to take into consideration plaintiff's evidence that Frost's truck was headed southwest, from which location it would be reasonable to expect it to drive south of the Barber-Greene to turn around rather than to back directly over the place where plaintiff was going to remove the material. The evidence was conflicting about so many matters which would enter into the determination of plaintiff's negligence that we cannot say that reasonable minds would not differ about it. We, therefore, hold that plaintiff was not guilty of con-

tributory negligence as a matter of law, and that the trial court correctly overruled defendant's demurrer to the evidence.

Defendant further assigns error in the giving and refusing of instructions. Defendant says that plaintiff's Instruction No. 1, covering the whole case and authorizing a verdict bases the right of the plaintiff to recover upon the failure of defendant to equip its trucks with horns and that this was not an issue made by the pleadings. Defendant also says that it was admitted there were no horns on the trucks so that putting such a requirement into this instruction made it practically a peremptory instruction directing a verdict; and that it, at least, gave undue prominence to evidence, which was undisputed, and was for that reason prejudicial. However, the instruction only required this finding along with other facts all of which were stated in the conjunctive and defendant admits that "it was possibly proper evidence of negligence but only one element of negligence." If this is true it was proper to require the jury to find it. In fact it would be reversible error to leave out of the main instruction authorizing a verdict any essential element of negligence. There was some evidence that some of the trucks were equipped with horns and that others were not. This, at least, had some bearing on the question of whether safe methods of carrying on the work required a warning and the kind of warning that could have been given. Even if it was necessary to require the jury to find that the trucks were not equipped with horns then it was merely the assumption of an additional burden on the part of the plaintiff and could not have been prejudicial under the circumstances of this case. We hold that it was not reversible error for the instruction to require such a finding.

Defendant further contends that it was error to give Instruction No. 3 hereinabove set out. However, we have held that the matter of assumption of liability for plaintiff's claim by the corporate defendant was waived by the stipulation made under the circumstances heretofore discussed.

Defendant further contends that it was error to give Instruction No. 5. There is nothing about this assignment of error in defendant's statement of points and authorities nor is any argument made about it in the brief. We, therefore, consider it abandoned. [Pence v. Kansas City Laundry Service Co., 332 Mo. 930, 59 S. W. (2d) 633; Johnson v. Schuchardt, 333 Mo. 781, 63 S. W. (2d) 17.]

Defendant further complains of the refusal to give its instructions E, M and O, which were as follows:

"E. The Court instructs the jury that under the facts and circumstances as shown by the evidence in this case, there was no nondelegable duty on the part of the defendant to furnish the plaintiff a safe place to work.

222

"M. The Court instructs the jury that if you find and believe from the evidence that from the character of the work in which the defendant was engaged and from the character of the work being done at the point or place where the plaintiff was employed, the character and condition of the rock pile upon which the plaintiff was employed was constantly changing by rock being taken therefrom and by rock being added thereto, and that the plaintiff was familiar with such constant change in such place of work, if you so find, then you are instructed it was not the nondelegable duty of the defendant to continually furnish the plaintiff a safe place in which to work, and you are. further instructed that under such circumstances, if you so find, that the plaintiff assumed the ordinary risk incident to such employment and was charged with the exercise of ordinary care in his own behalf, and you are further instructed that under such circumstances, if you so find, the only duty on the part of the defendant was to exercise ordinary care in the operation of the rock trucks hauling rock to said pile and in driving such trucks away from such pile.

"O. The Court instructs the jury that the defendant cannot be bound by or responsible for any instructions or promises made by one employee to another unless the employee who might make such promises or issue such instructions was as to such other employee a vice-principal for defendant, and if you find and believe from the evidence that the witness, Raymond Frost, was not the foreman or supervisor of plaintiff under authority from defendant, then you are instructed that the plaintiff cannot recover anything in this action by reason of any promise the said Raymond Frost may have made to plaintiff that he would instruct the rock trucks to warn plaintiff before backing up to the rock pile, even though you may believe that said Raymond Frost made any such promise and even though you may believe that said Raymond Frost was the foreman of the rock truck drivers."

What we have said in ruling the demurrer to the evidence disposes of defendant's contention and instructions E and M should have been given. Instruction E could not be proper if plaintiff made a case for the jury. Instruction M is too narrow and restricted in its statement of defendant's duty as plaintiff's employer. It does not consider the whole situation and overlooks defendant's duty in regard to maintaining a safe environment for plaintiff by providing for a safe method of use of the instrumentalities with which the work was required to be carried on in plaintiff's place of work. As to Instruction O defendant says that "there was a serious question as to whether or not Raymond Frost was the foreman over or a vice-principal as to the plaintiff in connection with this work;" that "there was at least a submissible jury question on that point," and that "the defendants were entitled to have it submitted to

the jury." The question of whether Raymond Frost was plaintiff's foreman was submitted by plaintiff's Instruction No. 1 by which the jury were required to so find before they could find for the plaintiff. It was also submitted again by defendant's Instruction K which told the jury that if they found that plaintiff and Maurice Frost were fellow servants and that plaintiff's injuries were due solely to the negligence of Maurice Frost their verdict must be for the defendant unless (among other things) "you further find and believe from the evidence that Raymond Frost was a foreman of the defendant and his superior in authority over the plaintiff and over the truck drivers hauling to the rock pile on which plaintiff was working, and unless you further find and believe from the evidence that said Raymond Frost as such foreman, if you so find, promised the plaintiff that he would instruct the drivers hauling to such rock pile to warn the plaintiff whenever such drivers were going to back up to such pile, and unless you further find and believe from the evidence that said Raymond Frost failed to so instruct such drivers to so warn the plaintiff." It was not necessary that the question of whether or not he was plaintiff's foreman be submitted a third time by Instruction O. Moreover, Instruction O, as offered, might be confusing and misleading to the jury as to the issues before them. The basis of plaintiff's cause of action and right to recover was not merely a promise to instruct the drivers to warn plaintiff of their movements but it was that defendant required the work in which plaintiff was engaged to be done in a manner which was not a reasonably safe method of doing the work, and did not in that respect fully comply with its duty with regard to the safety of plaintiff in his place of work from the use of the instrumentalities with which the work was required to be carried on therein. Furthermore, the promise of the foreman to plaintiff that he would be warned under certain circumstances was certainly to be considered in connection with the defense of contributory negligence even if not as a basis for plaintiff's recovery. The jury might believe from the language of this instruction that the promise of warning was to be eliminated from all consideration. The court gave at defendant's request a number of instructions covering various phases of defendant's defenses so that they had a favorable submission, and we hold that there was no reversible error in the court's refusal of these instructions.

Defendant also assigns error in regard to the examination of certain witnesses. Plaintiff's witness, Dr. Mercer, testified that plaintiff's condition prevented him from doing manual labor. On cross-examination, when asked if he knew that plaintiff was digging coal the summer before the trial, he said "if he is standing digging coal I don't see how it is possible for him to do it with his objective findings," and that "if he is doing manual labor I am wrong." Upon re-direct examination Dr. Mercer was asked if it would change

his opinion about plaintiff's being disabled if he was informed that plaintiff had been digging coal lying on his left side but was unable to lie on his right side; that at times afterwards he had to remain in bed for several days; and that he had not been able to load the coal he removed. Dr. Mercer answered "no." Defendant says that this was an argumentative question about a matter not subject to expert testimony and required the witness to pass upon a question determinable only by the jury. Plaintiff had testified to the matters stated in the question, and in view of the cross-examination we hold that it was not error for the court to permit this question on behalf of plaintiff on re-direct examination.

Defendant also says that it was improper for plaintiff's counsel, on direct examination of his witness Dr. Hollister, to ask him his opinion from his examination of plaintiff "as to whether there had been a slight or a large amount of violence applied to the part." His answer was "I thought there had been a large amount of violence." Defendant's contention is that this was not a question for an expert and called for speculation and conjecture. Dr. Hollister had first examined plaintiff in 1926 and had seen him every year thereafter and testified in detail concerning the tilting of the pelvis and curvature of the spine which he found. Following his answer to the question objected to, he testified that he based his opinion as to violence upon bruises and discolorations from smaller blood vessels allowing the blood to pour into the tissues around the muscles and near the nerves and that there was a hardening of the tissues under the skin caused by absorption of those blood clots which left a nerve disturbance and made the nerves more sensitive. This was to show that the accident was the cause of a condition, which plaintiff had testified about and said caused him to have a burning sensation of his skin where his severe bruises were located. We hold that there was no prejudicial error in admitting this testimony.

Defendant also complains that on cross-examination of its witness, Dr. Davis, plaintiff's counsel was permitted to ask him whether he had told plaintiff, "his patient and fellow townsman," that somebody had been asking about his physical condition and that he had talked to them about him. Dr. Davis was the doctor in Higginsville to whom plaintiff was taken immediately after his injury. He testified on behalf of defendant about having examined him previous to the accident and found him then suffering from a sacroiliac strain and wearing a sacroiliac belt. Defendant says that this was an attempt to browbeat and criticize the witness on a matter immaterial to any issue in the case, foreign to any question of impeachment, and purely for the purpose of trying to prejudice the jury against this witness whose testimony if believed would have prevented plaintiff from recovering any substantial amount. This cross-examination, of course, went more to the credibility, interest

and motive of the witness than to the facts about which he testified. The extent of cross-examination as to such matters is to a large extent within the discretion of the trial court. [Barraclough v. Union Pacific Railroad Co., 331 Mo. 157, 52 S. W. (2d) 998.] We do not find that permitting this question was such an abuse of discretion as to be prejudicial error.

Defendant further complains as to the argument made by plaintiff's counsel, as follows:

"Now, he says he has been fair and brought witnesses here who could tell you about this thing. I want to see if he has. Ten drivers were working there under the control of this company. He brought only three of them and two of them said, 'I don't know about it because I didn't go up any on the west side.'

"MR. HARRIS: The witnesses were equally available to him. He could have gotten them. MR. POPHAM: They were his employees and they didn't bring—MR. HARRIS: They are not on now and I object to it. MR. POPHAM: The Supreme Court says I have a right to do it. I can show Your Honor the case. MR. HARRIS: I object to that. The witnesses are equally available to him if he can find them. THE COURT: Overruled. Proceed. (To which ruling and action of the Court, the defendants, and each of them, by their counsel at the time duly excepted and still except.) MR. POPHAM: And they didn't put a one of them on this witness stand and not only that, they didn't put their superintendent, the man whose testimony I wanted to hear and wanted you to hear, on. They brought him here and they left him out in the hall and they didn't put him on this witness stand. . . . MR. POPHAM: I want you to remember this, that Charlie Kelso down there is just a working man, getting along the best he could, working all day there on this job and going out and hauling coal at night, with his responsibilities in life, with a strong back and good body and able to serve his Master every day. He has been reduced to his present condition through no fault of his own and I thought one of the pitiful things in the case was when the lawyer was talking to him about a sacroiliac belt and he said, 'One of the doctors up here told me I ought to get one but I didn't have the money to buy it.' MR. HARRIS: I object to that, he said nothing of the kind. MR. POPHAM: Well, that is the testimony in this case. MR. HARRIS: There is no such testimony in this case. THE COURT: I did not hear it. MR. HARRIS: I object to it as highly improper. THE COURT: The jury will remember what the evidence was. MR. POPHAM: Yes, and the jury will remember that he made that answer too. THE COURT: Go ahead. (To which ruling and action of the Court, the defendants, and each of them, by their counsel, at the time duly excepted and still except.)"

Defendant says that it was error to comment upon the absence of witnesses not in the employ or control of the other party and that

it was attempted to make an argument about the financial condition of the plaintiff, when there was no evidence about it, for the purpose of prejudicing the jury. There was nothing in the record to show whether or not the absent truck drivers were in the employ of defendant or what had become of them. [As to what is meant by "equally available witnesses" see Smith v. Kansas City Public Service Co. (Mo. App.), 56 S. W. (2d) 838, and cases cited; Winkler v. Pittsburgh, C., C. & St. L. Railroad Co., 321 Mo. 27, 10 S. W. (2d) 649; State ex rel. Meyer v. Daues, 315 Mo. 186, 285 S. W. 986.] It is also apparent that this was retaliatory argument to something said by defendant's counsel. [As to retaliatory remarks see Miller v. Collins, 328 Mo. 313, 40 S. W. (2d) 1062; Nelson v. Heine Boiler Co., 323 Mo. 826, 20 S. W. (2d) 906; Rainier v. Q., O. & K. C. Railroad Co. (Mo.), 271 S. W. 500; Gettys v. American Car & Foundry Co., 322 Mo. 787, 16 S. W. (2d) 85.] Plaintiff did testify that one of the doctors had told him to get an iliac belt and that he had said that he "did not have the means to test it out," to which there was no objection or motion to strike out by defendant at the time. The only objection to this part of plaintiff's argument was that it was improper because there was no such testimony in the case. Defendant's objection on that ground was not a valid objection. Only a portion of plaintiff's argument is given. The whole matter of prejudicial argument was before the trial court upon motion for new trial and the trial court which has the best opportunity to judge its propriety under all the circumstances and its effect, considering the behavior and intelligence of the jury and other incidents of the trial, overruled it. The trial court is allowed large discretion in permitting or restraining the argument and counsel is allowed to state the evidence and all reasonable inferences most strongly for his client and especially, where only a fragment of the argument is before this court, it will not interfere unless it clearly appears that the trial court abused its discretion in failing to restrain the argument. [Marlow v. Nafziger Baking Co., 333 Mo. 790, 63 S. W. (2d) 115; Goyette v. St. Louis-San Francisco Railroad Co. (Mo.), 37 S. W. (2d) 552.] We cannot say that there was such an abuse of discretion by the trial court in this case and therefore overrule defendant's assignments of error concerning the arguments made by plaintiff's counsel.

 Defendant further assigns as error the overruling of its motion to set aside the judgment on the ground that the jurors remained silent, when asked upon *voir dire* examination if they or any member of their family had ever made a claim for damages for personal injuries or been a participant in a damage suit. Defendant alleged in its motion that one of the jurors had received payment for injuries from a railroad company, that the wife of one juror had received settlement for personal injuries in a railroad accident,

and that the son of another juror filed suit for damages to his car in an automobile collision. There are two reasons why this matter is not before us for review. In the first place the *voir dire* examination of the jurors is not in defendant's bill of exceptions. In the second place this motion to set aside the judgment was filed more than four days after the trial. This is a mandatory requirement made by Section 1005, Revised Statutes 1929, and a motion filed after that time is a nullity so far as preserving matters for appellate review is concerned. An untimely motion, whatever its name or character, amounts to no more than a suggestion to the court that it should set aside the judgment of its own motion at the judgment term, which could be made orally as well as in writing and does not even carry the case over the term if not acted upon. [State ex rel. Conant v. Trimble, 311 Mo. 128, 277 S. W. 916; Marsala v. Marsala, 288 Mo. 501, 232 S. W. 1048; Ewart v. Peniston, 233 Mo. 695, 136 S. W. 422.] The trial court, of course, has power of its own motion to set aside a judgment and grant a new trial at any time during the trial term, whether suggestions are made or not, subject only to the qualifications that it must give the parties reasonable notice, allow them to be heard, and act upon reasonable grounds and not arbitrarily. [In re Zartman's Adoption, 334 Mo. 237, 65 S. W. (2d) 951; Beer v. Martel, 332 Mo. 53, 55 S. W. (2d) 482; Utz v. Dormann, 328 Mo. 258, 39 S. W. (2d) 1053.]

██ Defendant's final contention is that the judgment of $15,000 is excessive. Plaintiff was forty-five years old at the time he was injured. In 1912, while digging a well, plaintiff had fallen down the well and sustained some injuries. Defendant had evidence of a doctor, who had treated plaintiff two or three years before this injury, sustained while working for defendant, to the effect that he had a sacroiliac strain from a former injury and was wearing what was known as a sacroiliac belt because of this condition. Plaintiff, however, testified and had evidence to show that he had done all kinds of manual labor up until the time of his injury while working for defendant. It was shown that he had usually worked in the winter as a coal miner and in the summer at farm work ever since the time he had fallen in the well, except during two years when he was in the Army overseas. Plaintiff said: "I have dug coal and wheeled coal and hoisted coal and weighed coal, pitched wheat, pitched hay, shocked hay, cut corn, and done mighty near any kind of work that there was to be done; in winter time we worked in the mines, and whenever spring come, of course, there was no demand for coal, and just any kind of labor I could get, digging wells, cellars, or putting in tiling or any kind of work like that. . . . I worked right with men where I dug 100 bushels of coal right along one day with another." For several years prior to going to work for defendant he had leased a coal mine in which he and his boys worked

and in which he had as many as nine men working for him in the winter. Plaintiff said that the belt he was wearing was a motorcycle belt; that he got it in 1920 after he purchased a motorcycle; and that he had worn it ever since while doing heavy manual labor. He said that the doctor who testified for plaintiff told him that he had lumbago. Plaintiff had medical testimony to show that he could not have done the work he claimed to have done if he had a sacroiliac strain from his fall in the well.

Plaintiff also testified that, when he first went to work for defendant, he worked at shoveling dirt and rock, filling up ruts and mud holes and keeping the roadway in shape for the rock trucks to travel over it; and that he also helped haul drums of chloride to the job which weighed about 350 pounds and which he lifted with the assistance of only one other man. He said that he weighed 167 pounds at the time he was injured but only weighed 140 pounds at the time of the last trial. Plaintiff's medical evidence was to the effect that his injuries were permanent; that he was unable to do such manual labor as he had done before his injury; that his pelvis was tilted; that he had some curvature of the spine which had become more pronounced as time went on; that his right leg could not be brought up against his chest; and that he was nervous and often unable to sleep because his back pained him. Plaintiff had done some work with his boys in the coal mines in the summer before the last trial but he said he had to lie on his left side and could only dig away dirt with a pick underneath the coal and was not able to load it. He also had, for a while, a repair shop in Higginsville where he repaired guns, filed saws and worked on other articles but was unable to work steadily at this and had averaged only about $5 a week from all the work he was able to do. Prior to his injury his earnings had averaged $35 per week and he had made considerably more from the mine, at times when the price of coal was high. Plaintiff sustained no broken bones from his accident but was badly bruised. He claimed to have a burning sensation in his skin, which there was medical testimony to show was caused by hardening of the skin and involvement of the nerve ends at the places where there had been severe bruises. He was in the hospital in Kansas City eighteen days, but said that it was necessary for him to use crutches for some time thereafter and that he still walked with a cane. While the evidence justifies the finding that plaintiff suffered a severe sacroiliac strain, it shows no other serious injuries or complications and plaintiff has been able to do some work. Such an injury would seem to be comparable in effect and at least usually no more serious than the loss of a limb. [For a discussion of these cases see Jenkins v. Missouri State Life Ins. Co., 334 Mo. 941, 69 S. W. (2d) 666.] Judged by standards set in other cases of injuries in the sacroiliac region, we think this verdict must be held to be excessive by $4000.

[See Brunk v. Hamilton-Brown Shoe Co., 334 Mo. 517, 66 S. W. (2d) 903, l. c. 911, and cases there cited involving injuries of the sacroiliac region.] It will be noted that, in these cases where larger verdicts have been allowed to stand there were either other injuries in addition to a sacroiliac injury or the plaintiff was wholly incapacitated.

The judgment will be affirmed for $11,000, if plaintiff shall file within ten days a *remittitur* of $4000, as of the date of judgment; otherwise, the judgment will be reversed and the cause remanded. *Ferguson, C.,* concurs; *Sturgis, C.,* concurs in result.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Coles, J.,* not sitting.